**FILSON et al. v. FOUNTAIN.**

No. 9664.

United States Court of Appeals
District of Columbia Circuit.

Argued May 10, 1948.

Decided Oct. 18, 1948.

Mr. Camden R. McAtee, of Washington, D.C., for appellants.

Mr. William M. Aiken, of Washington, D.C., for appellee.

Before EDGERTON, CLARK, and WILBUR K. MILLER, JJ.

CLARK, J.

This is an appeal from a dismissal in the District Court of a civil action, by one

brother against another, for adjudication, recovery and enforcement of a claim for $6,000 as his unsatisfied equity arising out of a deed, related writings and transactions between the brothers with reference to certain improved real estate in New Jersey.

Paul Filson and Brainard Fountain were brothers, Filson having taken the name of his adoptive parents. In March of 1937, Filson, then bedridden, purchased a house and lot in Englewood, New Jersey, for $7,-000 cash.[1] On March 8, 1937, four days after the date of the contract of sale of the property to Filson,[2] the brothers executed in New Jersey a written agreement by which Filson agreed to give clear title to Fountain and wife by June 1, 1937, and also agreed to give the Fountains $3,000 to be used by the Fountains for improvement of the property. In return, the Fountains agreed to take title to the premises and to give back an eleven-year mortgage in an amount not exceeding $10,000. Shortly after the execution of this agreement Filson did give Fountain $3,000 for improvements but this amount, less about $166, was soon returned by Fountain who indicated that the house could not be adequately improved for that amount. Nothing further was done under the agreement by either party thereto and that agreement was apparently abandoned by tacit understanding between the parties.

Sometime in May of 1937, Filson applied for, and in August received, a $6,000 building and loan mortgage on the premises. Late in July, 1937, Fountain and wife moved into the premises, which were then still being remodeled by Filson. From August to December the Fountains paid rent in the form of monthly payments on the building and loan mortgage. In October, the improvements were completed at a total cost to Filson of about $8,000.

On December 24, 1937, Filson borrowed $3,000 from his (and Fountain's) mother, giving in return a second mortgage on the

---

[1] In a deposition later taken in contemplation of the instant litigation, Filson testified that he had no use for the property and had not even seen it prior to his purchase but that he bought it in reliance upon representations by Fountain who handled the entire matter while Filson was still in bed, Fountain having told Filson that he (Fountain) would like to have a home in Englewood.

[2] Although the contract of sale is dated March 4, 1937, title to the property was transferred to Filson by warranty deed dated May 12, 1937.

premises. Fountain also signed the bond in that transaction allegedly as additional security to the mother. That same day, Filson and wife deeded the property to Fountain and wife in consideration of the Fountains' assumption of the two mortgages. This deed was absolute in form, reciting an express consideration with habendum to the use of the grantees, their heirs and assigns forever. There was executed simultaneously with the deed to the Fountains an option agreement whereby, for a recited consideration, the Fountains agreed to give the Filsons a three-year first option to repurchase the property for $9,000. It was also agreed between the parties at that time and in writing that the option to repurchase may be terminated by payment to the Filsons of $6,000. This option was never exercised by either party and expired on December 24, 1940. It was Fountain's testimony by deposition that Filson agreed (apparently orally) to pay interest on the second mortgage and that Filson did partially pay such interest during 1938 and 1939.

In June, 1941, the Fountains refinanced the two mortgages by paying off and discharging completely the second mortgage and by making a new mortgage in the amount of $6,000 to the building and loan association. This latter mortgage is the only remaining encumbrance on the property and it had, at the time this litigation commenced, been about half paid off.

Without notice of any kind to the Filsons, the Fountains offered the property for sale in August, 1945. A buyer was found and a contract of sale drawn up, but this sale was never consummated due, according to Fountain's testimony, to the buyer's inability to pay the agreed price ($15,600) and the Fountains still have title to the property. As soon as Filson learned of the proposed sale he called Fountain, who was then living in Washington, D. C., and inquired about his (the Filsons') equity in the property. Fountain then told Filson that he believed Filson had no remaining equity in the property.[3]

The depositions of Filson and of Fountain, from which the bulk of the foregoing information was gleaned, were taken in Washington on November 19, 1945.

In their complaint, filed below in 1946, the Filsons allege that the conveyance to the Fountains was for a principal consideration of $15,000, to be evidenced by the Fountains' assumption of $9,000 in mortgages and the further payment of $6,000 by the Fountains to the Filsons. Accordingly, recovery was sought on the theory of a resulting trust in favor of the Filsons in the amount of .$6,000 plus interest. Fountain, joint defendant with his wife, died after this action was instituted. The Filsons moved to substitute in his place his wife in her representative capacity. This motion was denied for want of prosecution. In May, 1947, the matter came on for hearing on the defendant's motion for summary judgment and on plaintiffs' motion to vacate the order denying the motion for substitution. Summary judgment was given for defendant Fountain and plaintiffs' motion to vacate was denied. The trial judge entered no findings of fact and no conclusions of law, but these are not required in the circumstances of this case.[4]

Since the land involved in this suit is in New Jersey, the law of that state must govern any decision here with regard to the interests, legal or equitable, of the parties in that property, and all parties concede that this is so. As indicated above, the complaint filed below sought equitable relief in the form of a declaration of a resulting trust in favor of the Filsons. The trial court refused to grant this relief and sustained the defendant's motion for summary judgment, relying, according to the parties, on the case of Down v. Down, Ch.

[3] Fountain testified that in a later conversation concerning this equity he told Filson that all the Fountains were doing was transferring the proceeds from the sale of the house in Englewood to the purchase of a house in Washington, D. C.

[4] "Since a summary judgment presupposes that there are no triable issues of fact, findings of fact and conclusions of law are not required in rendering judgment, although the court may make such findings with or without request. Failure to make and enter findings and conclusions is not error." Lindsey v. Leavy et al., 9 Cir., 1945, 149 F.2d 899, 902.

**1002**

1912; 80 N.J.Eq. 68, 82. A. 322, 324. In that case a husband and wife joined in an absolute conveyance of land to a third party who was a mere conduit of title and who in turn conveyed absolutely to the wife. Each of the two conveyances was absolute in form, recited a specific money consideration and was to the use of the grantee. In construing the effect of these conveyances, the New Jersey court held that both legal and equitable title to the land was in the wife and that no resulting trust could arise in favor of the husband. The following rule of law is stated in the Down case:

"But, should it be thought that the views above expressed too closely confine the field of operation of resulting trusts, I think it is clear that the accepted doctrine that a resulting trust cannot arise in favor of a grantor, in the absence of fraud, under a deed of conveyance expressing a money consideration, with declaration to the use of the grantee, must be regarded as operative to deny relief to cross-complainant in this suit." [5]

■ This is the prevailing law of New Jersey as to resulting trusts. [6]

Applying the facts of the instant case to the principle above set forth it is immediately apparent that the trial court in this case correctly ruled, by implication, that there was no resulting trust in favor of the Filsons because the deed of December 24, 1937, recited an express consideration and granted the property to the use of the grantee Fountains. However, it does not follow from this that the Filsons should be denied all relief as was done by the trial court in this case. The record shows that the Filsons' complaint contained a general prayer for "all other relief to which they appear entitled." This was sufficient to entitle them to any other appropriate relief which may be granted by a court of equity. [7] We believe that the Filsons are entitled to other relief and hence that the trial court erroneously granted summary judgment to defendant Fountain.

■ Although we believe this to be an ill-advised suit in this jurisdiction in that it should have been instituted in New Jersey, the situs of the land, yet, having admitted personal jurisdiction over all parties, we can and shall order judgment to be rendered *in personam* against Mrs. Fountain, present appellee. It is clear from the record that Filson invested at least $15,000 in Englewood property having paid an initial $7,000 for the property and having improved it at a cost of at least $8,000. [8] It is conceded by all parties that the only consideration paid by the Fountains to the Filsons for the absolute conveyance of the property to the Fountains was the assumption by the Fountains of the $9,000 in mortgages. Fountain testified that the Filsons agreed orally to pay, and did pay, part of the interest on the mortgages. It is thus apparent that the Filsons were "out of pocket" at least $6,000 as a result of the above-described transactions. Filson testified that he never intended this $6,000 as a gift to his brother and that Fountain never expected him to make such a gift. When asked if Filson intended to give him the $6,000, Fountain replied: "I don't think he ever intended to give it to me." Fountain also stated that he had never paid the Filsons the $6,000. The option agreement was drawn up by a New Jersey attorney now dead. When questioned about this agreement, Filson stated as follows:

"When I went over to sign this agreement with the attorney—I spoke to Mr.

---

[5] 82 A. at page 324.

[6] See also, Surye et al. v. Lemberger et ux., Err. & App. 1921, 92 N.J.Eq. 656, 114 A. 454; Brown et al. v. Murray et al., Ch. 1922, 94 N.J.Eq. 125, 118 A. 534.

[7] In Helvestine v. Helvestine, 1937, 67 App.D.C. 121, 122, 89 F.2d 970, 971, this court said:

"It is settled law that 'if the plaintiff should mistake the relief, to which he is entitled in his special prayer, the court may yet afford him the relief, to which he has a right, under the prayer of general relief, provided it is such relief as is agreeable to the case made by the bill.'".

[8] Appellee asserts on appeal that it is not conceded that the improvements cost $8,000. However, Fountain's own statements by deposition show that he could not improve the premises for $3,000., that he was shown all bills for improvement and did not object thereto, and that Filson had spent between $15,000. and $16,000. on the property.

Morrison [the attorney] about it. I asked him what protection I would have if I turned this house over to him [Fountain] just for the title. He told me we could include in the option the $6,000 balance that I had in there, that my brother would have to give me in the event of a sale. He said, 'In the event that the option expires and you didn't take up the option, you would lose your right to buy that property back for $9,000 but you would not lose your $6,000 equity.' "

We believe that all of the above-recited circumstances taken together clearly show an acknowledged indebtedness of the Fountains to the Filsons in the amount of $6,000. The expiration of the option to repurchase unexercised had no effect upon the indebtedness. The option agreement did not create the indebtedness but was mere evidence thereof and thus its expiration did not and could not destroy or otherwise affect the indebtedness. By the expiration of the three year option to repurchase Filson lost the right to repurchase for $9,000 and that is all he lost and all that the parties intended he should lose.

■ The lower court, sitting as a court of equity, had personal jurisdiction over all the parties and had before it all of the various documents from which this controversy arose in addition to the extensive depositions of Filson and Fountain. It has long been an established rule that the decrees of a court of equity are *in personam* and may be enforced in all cases where the parties are within its jurisdiction despite the fact that the *res* of the controversy is or may be beyond the territorial jurisdiction of the tribunal.[9] It is equally true that a court of equity, having once acquired jurisdiction, will retain it to do complete justice. The court below should have found an indebtedness by the Fountains to the Filsons in the amount of $6,000 plus interest, and then rendered personal judgment against Mrs.

Fountain in that amount, since a personal money judgment would be, under the circumstances of this case, the most effective and complete remedy possible. For failure so to do, we must reverse the judgment entered below.

■ Appellants assert also as error the denial of the motion to substitute Mrs. Fountain in her representative capacity for her husband, the latter having died since the suit was instituted. We agree with appellants that this too was error. Title to the Englewood property was in the names of Anna and Brainard Fountain jointly. Their indebtedness was also joint. The facts that under New Jersey law the Fountains became tenants by the entireties and that under that law Mrs. Fountain took no additional interest in the land from her husband upon his death[10] do not diminish Mrs. Fountain's responsibility as administratrix of her husband's estate to satisfy his existing debts of which this joint indebtedness for $6,000 was one. Appellee concedes that this is true if we find, as we have, that Brainard Fountain had assumed the $6,000 obligation.

■ In ruling as we do we recognize that a court of equity is generally reluctant to grant a mere recovery of money, but we believe that this case is one peculiarly within the concurrent jurisdiction of equity since the remedy at law is not certain, complete and sufficient.[11]

Accordingly, the judgment rendered below is hereby reversed in all respects and remanded to the District Court with instructions to grant the motion for substitution and to enter judgment in the amount of $6,000 plus interest in favor of the Filsons against Mrs. Fountain individually and as administratrix of the estate of Brainard Fountain.

Reversed and remanded with instructions.

9 Phelps v. McDonald, 1879, 99 U.S. 298, 25 L.Ed. 473; Ager v. Murray, 1882, 105 U. S. 126, 26 L.Ed. 942; Gilbert et al v. Beach et al., D.C.1941, 42 F.Supp. 168, affirmed *sub nomine* Beach v. Gilbert et al., 1943, 77 U.S.App.D.C. 117, 133 F.2d 50; Indemnity Ins. Co. v. Smoot, 1945, 80 U.S.App.D.C. 287, 152 F.2d 667, certiorari denied 1946, 328 U.S. 835, 66 S.Ct. 981, 90 L.Ed. 1611.

10 See In re Staiger's Estate, Err. & App. 1929, 104 N.J.Eq. 149, 144 A. 619.

11 See 1 Pomeroy's Equity Jurisprudence (Symons' 5th Ed. 1941) §§ 178 et seq., particularly § 180.