**James R. TYGRETT, Appellant,**

v.

**Walter E. WASHINGTON, Commissioner, District of Columbia, et al.**

No. 72–1876.

United States Court of Appeals, District of Columbia Circuit.

Argued July 12, 1973.

Decided Oct. 23, 1974.

Rehearing Denied April 8, 1976.

---

Glenn R. Graves, Washington, D. C., with whom John W. Karr, Washington, D. C., was on the brief, for appellant.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., for the District of Columbia, with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellees.

Before BAZELON, Chief Judge, BASTIAN, Senior Circuit Judge, and ROBINSON, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal brings on for review a judgment of the District Court sustaining the discharge of a District of Co-

lumbia police officer by his superiors. We find, upon analysis of the record, that the dismissal was directly attributable to statements by the officer of his views on a matter of public as well as individual concern. We find, too, that the judgment lacks the support of evidence and a judicial determination that the statements detrimentally affected the efficiency of the officer or the employing agency in the rendition of service to the community. On these bases, we reverse and remand the case to the District Court for further proceedings.

## I

The relevant events are not in serious dispute. Appellant was a first-year patrolman-officer in the Metropolitan Police Department. For a newcomer at that rank, service of a one-year probationary period is prerequisite to eligibility for a permanent appointment to the force.[1] Near the end of his probationary period, appellant participated actively in a meeting of the District of Columbia Policemen's Association regarding, and in a congressional lobby for, a bill proposing a pay raise for policemen and firemen.[2] The present controversy arose when Washington newspapers reported statements he made in favor of a "sick-in"[3] of police officers if the pending bill did not pass.

The Department deemed some of the statements objectionable[4] and appellant was promptly questioned about them. In an interview conducted by Captain Robert E. Ellis and Inspector Robert W. Klotz, appellant admitted that, with minor exceptions, the press had quoted him accurately. During the interview, appellant also declared that if a "sick-out"[5] was the "general consensus" of his fellow officers, he would report himself ill and join in the effort.[6] After the interview,[7] Inspector Klotz submitted to the Chief of Police a report citing appellant's "poor attitude and lack of loyalty,"[8] and recommending his dismis-

---

1. D.C. Code §§ 4–103, 4–105 (1973). See note 25, *infra*.

2. Appellant's off-duty lobbying activities did not infringe departmental regulations. See note 7, *infra*.

3. As viewed by the Department, a "sick-in" is the refusal of an officer to report for duty, accompanied by a false representation that the officer is too ill to engage in police work. See text *infra* following note 9.

4. The statements singled out were the following:
    Man, I worked on the Hill for two years. They're scared to death of rallies.
    If it comes to it, I'm calling a blue flu. I'm willing to put my job on the line.
    If this doesn't work, I say go on sick leave.
    We're going to hold a special meeting and see what other action can be taken. The only action left is a sick-in. I'm for it and if the men want it, I'll organize it.

5. "Sick-out" seems synonymous with "sick-in." See note 3, *supra*, and note 6, *infra*.

6. As portrayed in Officer Klotz's report on the interview,
    Officer Tygrett stated that if a number of officers wished to engage in a "sick-out" as a means of protest, that he would organize and lead such action and would falsely report himself ill, in order to evade performance of police duties. . . . [H]e persisted in his statements as to his intentions to take part in, organize and advise men to abuse the sick leave regulations and justified his position as a matter of conscience.

7. When the interview ended, Inspector Klotz gave appellant a direct order to "cease advocating [that] police officers falsely represent themselves . . . too ill to perform police duties." The order also admonished appellant to refrain from ever reporting himself "too ill to perform police functions in order to evade [his] duty as a police officer." Inspector Klotz stated that he would take "disciplinary action" against appellant if the order was violated.
    Appellant inquired whether the order would be infringed if he engaged in "another lobby attempt on the Hill." Inspector Klotz informed him that the order did not bar lobbying activities by off-duty policemen, and that such activities were a form of protest uninhibited by departmental regulations.

8. In relevant part the report read:
    One of the purposes of the probationary tenure is to monitor and evaluate the actions, activities, honesty and attitude of the applicant prior to his receiving a permanent appointment as an officer. While

sal "for conduct unbecoming and prejudicial to the Department." [9]

A few days later, appellant was notified that he would be separated from the police force. The letter of notification informed appellant that "[t]his action is being taken because you have been quoted by news media as advocating that members of this Department take part in a 'Blue Flu' or 'Sick Out' as a means of protesting the lack of action by Congress regarding the proposed pay bill for the Police and Fire Departments." By the Police Department's interpretation, the letter said, "[t]his action would involve large numbers of officers falsely reporting themselves too ill to perform their assigned duties." "Such conduct," the letter continued, "indicates your intention to violate the criminal prohibitions contained in" an anti-strike statute [10] and "is also clearly in violation of" an anti-strike departmental regulation. [11]

The letter of notification also referred to the interview. "Subsequent to the publication of the statements attributed to you by the news media," it read, "you had an opportunity to reflect on these statements," but in the interview "you verbally reinforced these statements as to their accuracy." The letter concluded that "[s]uch conduct clearly indicates that you do not intend to pursue your career as a Police Officer in such a manner as would enhance the image of the Police Department or aid in carrying out its obligation to the community which it serves."

Prior to the effective date of separation, appellant filed suit in the District Court. His complaint alleged that his imminent discharge was occasioned by an exercise of his First Amendment right of free speech, and by an asserted violation of the anti-strike statute [12] and its counterpart in departmental regulations. [13] The complaint asked the District Court to declare the dismissal unlawful, to enjoin it, and to declare the statute and the regulation unconstitutional. Appellees [14] responded to the complaint and later moved for summary

---

the Department's investment in selection and training recruits is considerable, should definite indications of poor attitude, lack of honesty or loyalty to the Department and community surface during this period, these doubts, I believe, must be resolved in favor of the Department.

Officer Tygrett is a well spoken, impressive young man; however, by his own admission, he has indicated that his loyalty and devotion to duty will be subordinated to his personal desires if he feels it necessary, and will even knowingly and purposely depart from the truth to achieve his goal. Moreover, he would quite willingly engage in conduct that would gravely hinder the efficient operation of this Department in furnishing service to the community. While the officer has not yet falsely reported himself sick or organized, as far as we know, such action by others; he has definitely stated his intention to do so. I do not believe that it is necessary or reasonable to assume the Department should refrain from action until a violation occurs.

I believe these indicators of poor attitude and lack of loyalty are too serious in their implications to be ignored. I feel the officer has clearly shown by his actions and statements that he is not suitable to perform the role of police officer in the District of Columbia. Therefore, I recommend that the officer's probationary appointment be terminated for conduct unbecoming and prejudicial to the Department.

9. See note 8, *supra.*

10. D.C.Code § 4–125 (1973), which in relevant part provides:

. . . Any member of the Metropolitan Police who enters into a conspiracy, combination, or agreement with the purpose of substantially interferring with or obstructing the efficient conduct or operation of the police force in the District of Columbia by a strike or other disturbance shall be guilty of a misdemeanor and upon conviction shall be punished by a fine of not more than $300 or by imprisonment of not more than six months, or by both.

11. MPD General Order No. 1, ser. 1201 (1971), which tracks the anti-strike statute in practically identical language.

12. See note 10, *supra.*

13. See note 11, *supra.*

14. Appellees are the District of Columbia's Mayor-Commissioner and its Chief of Police.

844

judgment.[15] Appellant opposed the motion on the ground that the case posed genuine issues of material fact properly resolvable only at a trial.

■ The District Court granted the motion. In a written opinion[16] incorporating "findings of fact,"[17] the court articulated its views. The court rejected appellant's contention that the only reason for his separation from service was that he made the statements in question:

> [Appellant's] statements alerted his supervisors to an attitude incompatible with the obligations of the department to the community. His supervisors would have been remiss in their duty not to have examined further into such an attitude on the part of a probationary officer. They did so and found that he was unfit for permanent appointment to the force, despite the loss to the department of its considerable investment in an otherwise promising candidate.[18]

On this basis, the court deemed resolution of appellant's free-speech claim unnecessary,[19] but nonetheless undertook to consider it "for the record."[20] The court held that "[i]n the circumstances of this case, [appellant's] interest as a citizen in making such statements whether in public or in an interview with his superiors is outweighed by the interests of the police department where the department is judging the conduct and capacity of a probationary officer."[21] In so concluding, the court laid aside judicial opinions[22] underlying appellant's argument, in the court's words, that "the burden [was] on the police department to make a factual showing that the employee's statements resulted in: (1) reduced efficiency or usefulness of the employee as a police officer; or (2) reduced efficiency, discipline or harmony in the operation of the police department."[23] The court felt that "such a burden would be placed on the police department only if [appellant] first made a sufficient showing that his dismissal resulted solely in reprisal for

15. See Fed.R.Civ.P. 56.

16. Tygrett v. Washington, 346 F.Supp. 1247 (D.D.C.1972).

17. Findings of fact are not required in connection with an award of summary judgment. Fed.R.Civ.P. 52(a); Gurley v. Wilson, 99 U.S.App.D.C. 336, 337, 239 F.2d 957, 958 (1956); Simpson Bros. v. District of Columbia, 85 U.S.App.D.C. 275, 279–280, 179 F.2d 430, 434–435 (1949), cert. denied, 338 U.S. 911, 70 S.Ct. 350, 94 L.Ed. 561 (1950); Filson v. Fountain, 84 U.S.App.D.C. 46, 48, 171 F.2d 999, 1001 (1948), rev'd on other grounds, 336 U.S. 681, 682–683, 69 S.Ct. 754, 93 L.Ed. 971 (1949). That is because the judicial function on such a motion "is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue." Nyhus v. Travel Management Corp., 151 U.S.App.D.C. 269, 271, 466 F.2d 440, 442 (1972). See also Fed.R.Civ.P. 56(c). Nonetheless, findings may properly accompany the ruling on the motion, Gurley v. Wilson, supra, and they may serve a useful purpose. "Findings may well be helpful to the appellate court in making clear the basis for the trial court's decision and in indicating what the court understood to be the undisputed facts on which summary judgment was granted." 9 C. Wright & A. Miller, Federal Practice § 2575 at 692–93 (1971). That however, is the sole office of findings in relation to summary judgment motions; the findings are not really findings of fact. And it bears emphasis that such findings are not protected by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) upon review of the summary judgment. Williams v. Eaton, 443 F.2d 422, 433 (10th Cir. 1971); 9 C. Wright & A. Miller, Federal Practice § 2575 at 693. It follows that the "findings of fact" in the case at bar do not command the deference accorded those made in nonjury and advisory-jury cases.

18. Tygrett v. Washington, supra note 16, 346 F.Supp. at 1250.

19. Id.

20. Id. at 1250–1251.

21. Id. at 1251.

22. Those referred to by the court were Battle v. Mulholland, 439 F.2d 321 (5th Cir. 1971); Brukiewa v. Police Comm'r of Baltimore, 257 Md. 36, 263 A.2d 210 (1970); and In re Gioglio, 104 N.J.Super. 88, 248 A.2d 570 (1968).

23. Tygrett v. Washington, supra note 16, 346 F.Supp. at 1251–1252.

his exercise of First Amendment rights"[24] Said the court:

In the instant case, [appellant] has not shown that his dismissal resulted from the exercise of his First Amendment right of free speech. He was dismissed pursuant to D.C.Code § 4–105 [25] . . . after his supervisors determined that his conduct or capacity for permanent appointment was unsatisfactory. In making such determinations, the officials of the department need not be deaf to avowed statements of a probationary officer which evidence an attitude inimical to the discipline and efficiency of the department and its obligations to the community.[26]

The appeal to this court followed.

## II

We find ourselves unable to avoid a confrontation with appellant's First Amendment claim.[27] The District Court acknowledged that the factor precipitating the sequence of events leading to appellant's discharge was newspaper publicity of his statements.[28] The court felt, however, that the discharge result-ed, not from the utterances themselves, but from an unsatisfactory attitude reflected by them.[29] The letter notifying appellant of his separation makes clear that the Police Department similarly viewed the matter as one involving attitude rather than speech.[30]

We think this analysis does not bear scrutiny. The words appellant spoke were the only indicia of his attitude, and the attitude was inseparably intertwined with the content of the statements.[31] It was solely because of what appellant said that the Department perceived the attitude which it deemed inimical to appellant's continuance as a police officer. And it is clear beyond peradventure that but for the remarks —allegedly protected exercises of the right of free speech—appellant would not have been dismissed from the police force. The First Amendment's Free Speech Clause [32] cannot be laid aside simply on the basis that the speaker was penalized not for his speech but for a state of mind manifested thereby.

Nor does the fact that appellant was a probationary police officer at the time of his ouster relieve us of the duty

24. *Id.* at 1252.

25. "No person shall receive a permanent appointment who has not served the required probationary period, but the service during probation shall be deemed to be service in the uniformed force if succeeded by a permanent appointment, and as such shall be included and counted in determining eligibility for advancement, promotion, retirement, and pension in accordance with existing law. If at any time during the period of probation, the conduct or capacity of the probationer is determined by the Commissioner of the District of Columbia, or his designated agent, to be unsatisfactory, the probationer shall be separated from the service after advance written notification of the reasons for and the effective date of the separation. The retention of the probationer in the service after satisfactory completion of the probationary period shall be equivalent to a permanent appointment therein." D.C.Code § 4–105 (1973). There is no contention that appellant's dismissal was procedurally flawed.

26. Tygrett v. Washington, *supra* note 16, 346 F.Supp. at 1252.

27. Appellant asserts, additionally to the argument that his utterances were protected speech, that the provision of the anti-strike statute referred to in the letter of dismissal, see note 10, *supra*, is unconstitutionally overbroad. See Police Officers' Guild v. Washington, 369 F.Supp. 543 (D.D.C.1973), a holding on a different provision of the law. In the view we take of the case, we need not reach on this appeal any question as to the validity of that statute.

28. See text *supra* at note 18.

29. See text *supra* at notes 18, 25–26.

30. See text *supra* following notes 9, 10–11.

31. Compare Street v. New York, 394 U.S. 576, 589, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); Thomas v. Collins, 323 U.S. 516, 540–541, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Ring v. Schlesinger, 164 U.S.App.D.C. 19, 30, 502 F.2d 479, 490 (1974); Walters v. Peterson, 161 U.S.App.D.C. 265, 271, 495 F.2d 91, 97 (1973).

32. "Congress shall make no law . . . abridging the freedom of speech. . . . ." U.S.Const. amend. 1.

to consider his constitutional argument. We are mindful of the statutory provision, upon which the District Court relied,[33] that an officer in that status may be dismissed "after advance written notification of the reasons for and the effective date of the separation" if "during the period of probation [] the conduct or capacity of the probationer is determined . . . to be unsatisfactory."[34] It does not follow, however, that an exercise of free speech could occasion appellant's removal simply because he lacked more permanent tenure.[35] In Perry v. Sinderman,[36] the Supreme Court held flatly that lack of a contractual or tenure right to continued employment does not alone defeat the claim that termination of the employment violated the Constitution.[37] On the contrary, the Court admonished, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely."[38] More specifically, "[i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests —especially, his interest in freedom of speech."[39] It thus becomes necessary, for purposes of the statute, to ascertain whether appellant's utterances could legally justify his superiors' conclusion that his "conduct or capacity" as a police

officer was "unsatisfactory." Were this not so, the Police Department would be left free to "produce a result which [it] could not command directly,"[40] and "[s]uch interference with constitutional rights is impermissible."[41]

We must, then, face the question whether the comments which the Department found objectionable provided a valid basis for appellant's discharge. And it is important to note that, in addressing this question, we must limit our concern to the observations which appellant expressed publicly,[42] in contradistinction to those voiced at the ensuing interview,[43] because the discharge was predicated on the former to the exclusion of the latter. True it is that Inspector Klotz, in recommending the dismissal, emphasized appellant's pronouncements at the interview,[44] but the Department's assignment of reasons for the dismissal was much narrower.

The letter notifying appellant of the impending discharge stated specifically that "[t]his action is being taken because [appellant had] been quoted by news media as advocating that members of this Department take part in a 'Blue Flue' or 'Sick Out' . . ."[45] and because "'[s]uch conduct . . . indicates [appellant's] intention to violate the'" anti-strike statute and regulation.[46] The letter did mention the interview,

33. See text *supra* at note 25.

34. See note 25, *supra*.

35. This the District Court likewise recognized Tygrett v. Washington, *supra* note 16, 346 F.Supp. at 1250.

36. 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

37. *Id.* at 596–598, 92 S.Ct. 2694.

38. *Id.* at 597, 92 S.Ct. at 2697. See also the numerous decisions in accord there cited.

39. *Id.* Compare Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). So, we no longer regard as viable Justice Holmes' statement in McAuliffe v. Mayor of New Bedford, 153 Mass. 216, 29 N.E. 517 (1892), that one "may have a constitutional right to

talk politics, but he has no constitutional right to be a policeman." See also Meehan v. Macy, 129 U.S.App.D.C. 217, 226–227, 392 F.2d 822, 831–832 (1968).

40. Perry v. Sinderman, *supra* note 36, 408 U.S. at 597, 92 S.Ct. at 2697, quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

41. Perry v. Sinderman, *supra* note 36, 408 U.S. at 597, 92 S.Ct. at 2697. See also Ring v. Schlesinger, *supra* note 31, 164 U.S.App.D. C. at 27, 502 F.2d at 487.

42. See note 4, *supra*.

43. See notes 6, 8, *supra*.

44. See note 8, *supra*.

45. See text *supra* following note 9.

46. See text *supra* at notes 10–11.

but merely to make the point that thereat appellant "verbally reinforced these statements as to their accuracy." [47] Nowhere does the letter base the separation action upon assertions at the interview which went beyond "verbal reinforce[ment]" of the "accuracy" of the statements quoted by the press.[48]

The premises upon which the validity of an administrative order is to be decided are only those upon which the agency predicated its action;[49] "[i]t is 'a simple but fundamental rule of administrative law . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.' " [50] We are not at liberty to furnish "an alternative, unstated ground to support an agency's decision if that ground is one that 'the agency alone is authorized to make.' " [51] We turn to a consideration of the validity of appellant's separation from the force, on the basis upon which the Police Department chose to rest it.

## III

In Pickering v. Board of Education,[52] the Supreme Court held that a governmental employee is constitutionally entitled to participate in open public discussion so long as his utterances do not affect the efficiency of his own performance or the efficiency of the agency in which he is employed.[53] In that case, an Illinois public schoolteacher was discharged for writing a letter to a newspaper criticizing the handling of fiscal problems by his superiors. The Court acknowledged that "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." [54] Nonetheless, the Court declared, "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of [government], as an employer, in promoting the efficiency of the public services it performs through its employees." [55]

As the District Court observed in the instant case there are elements present here that were wholly absent in *Pickering*.[56] Appellant's remarks at the meeting of the Policemen's Association and before the officer-lobbyists assem-

---

47. See text *supra* following note 11.

48. See notes 6, 8, *supra*.

49. Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 270, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Westminster Broadcasting Corp. v. FCC, 148 U.S.App.D.C. 332, 336, 459 F.2d 1356, 1360 (1972); Local 833, UAW v. NLRB, 112 U.S.App.D.C. 107, 113, 300 F.2d 699, 705, cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962); NLRB v. Capital Transit Co., 95 U.S.App.D.C. 310, 313, 221 F.2d 864, 867 (1955); Democrat Printing Co. v. FCC, 91 U.S.App.D.C. 72, 77–78, 202 F.2d 298, 302–303 (1953); Mississippi River Fuel Corp. v. FPC, 82 U.S.App.D.C. 208, 224, 163 F.2d 433, 449 (1947).

50. Westminster Broadcasting Corp. v. FCC, *supra* note 49, 148 U.S.App.D.C. at 336, 459 F.2d at 1360, quoting SEC v. Chenery Corp., *supra* note 49, 332 U.S. at 196, 67 S.Ct. 1575.

51. Gulf States Utils. Co. v. FPC, 411 U.S. 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635 (1973), quoting SEC v. Chenery Corp., *supra* note 49, 318 U.S. at 88, 63 S.Ct. 454.

52. 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

53. *Id.* at 568, 88 S.Ct. 1731.

54. *Id.*

55. *Id.*

56. "An examination of the statements in appellant's letter objected to by the Board reveals that they, like the letter as a whole, consist essentially of criticism of the Board's allocation of school funds between educational and athletic programs, and of both the Board's and the superintendent's methods of informing, or preventing the informing of, the district's taxpayers of the real reasons why additional tax revenues were being sought for the schools. The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony

bled on the Capitol grounds can hardly be characterized as mere criticism of superiors.[57] Beyond these considerations is the relationship of departmental discipline, harmony and morale,[58] and as well of individual loyalty and respect, to the proper functioning of a police force, to which the safety of the community is entrusted.[59]

It does not necessarily follow, however, that appellant's utterances—arguably protected by the Free Speech Clause—actually had a deleterious effect on police operations. Much depended upon other circumstances, as to which there is no evidence in the record, which would bear importantly upon any inquiry in that regard. In their full context, appellant's statements may have amounted to no more than a lobbying maneuver, instead of a serious exhortation to strike action.[60] Appellant's listeners may have accepted him—a first-year recruit—simply as a rhetorician rather than as a leader.[61] And any assumption that the police corps was susceptible to incitement to a "sick-out" or "blue flu" is perhaps a gross underestimate of its dedication to duty.[62] These considerations, along with the statements themselves, deserved weight on the scale.

The crucial question for decision was whether appellant's remarks, in the particular circumstances surrounding them, actually impinged upon qualities making

for an effective police force in such manner as to imperil its efficiency.[63] It is clear that the District Court did not make that determination. The court's basic premise was that appellant was discharged because of his attitude rather than his utterances, and that for that reason resolution of appellant's First Amendment contention was unnecessary.[64] And while the court, properly we think, undertook to deal with that claim "for the record," [65] its technique was faulty to a fatal degree.

Citing factual deviations from *Pickering*,[66] the District Court concluded that "[i]n the circumstances of this case, [appellant's] interest as a citizen in making such statements whether in public or in an interview with his superiors [67] is outweighed by the interests of the police department where the department is judging the conduct and capacity of a probationary officer." [68] It is evident, however, that the court did not have all of the relevant circumstances before it at the time.[69] The court's decision was reached, not following a trial, but on appellees' motion for summary judgment; consequently, there was no evidence to portray the circumstances in which appellant's opinions were expressed. Indeed, an affidavit of appellant, before the court when the motion was decided, called attention to his own performance as a police officer,[70]

---

among co workers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. Accordingly, to the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct, . . . may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocably reject it." Pickering v. Board of Educ., *supra* note 52, 391 U.S. at 569–570, 88 S.Ct. at 1735 (footnotes omitted).

57. Compare notes 4 and 56, *supra*.

58. See note 56, *supra*.

59. See note 56, *supra*.

60. The record discloses that appellant's fellow officers declined to take any strike action.

61. The record also discloses that appellant's remarks at the meeting were countered by the president of the Policemen's Association, who called appellant a "turncoat."

62. See note 60, *supra*.

63. See text *supra* at notes 54–55.

64. See text *supra* at notes 18–19.

65. See text *supra* at note 20.

66. Tygrett v. Washington, *supra* note 16, 346 F.Supp. at 1251.

67. We put aside appellant's declarations at the interview. See text *supra* at notes 42–51.

68. See text *supra* at note 21.

69. See text *supra* at notes 60–62.

70. The affidavit states:

Since joining the Police Department, I have faithfully and conscientiously performed my duties as a police officer.

and denied that he attempted to influence his fellow officers to act out his views.[71]

The District Court rejected appellant's argument that appellees bore the burden of a factual demonstration that appellant's statements detrimentally affected his efficiency as a police officer or the Department's efficiency as a police force.[72] That, we hold, was error. Appellant's position finds direct support in judicial decisions,[73] as well as full support in established constitutional doctrine. Governmental action affecting fundamental rights does not enjoy a presumption of constitutionality; rather, the burden is upon government to show a compelling governmental interest justifying the intrusion.[74] Governmental infliction of a penalty for speech arguably protected by the First Amendment falls squarely within the compass of this requirement.[75] The District Court recognized these principles but deemed them inapplicable on the ground that appellant's dismissal was unrelated to his utterances.[76] For reasons previously articulated, we are unable to accept that view.[77]

Though a police officer, appellant did not completely shed his First Amendment rights when he accepted employment as a public servant. "[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." [78] To be sure, as a policeman appellant was bound to a high standard of accountability for comments made to fellow officers or to the public.[79] He could not, however, be banished from the force "on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." [80] Rather, his dis-

---

Throughout my probationary year. I have been told by all of my superiors that my performance has been exemplary. All of my efficiency ratings have been either good or excellent. I have received a letter of appreciation for work I performed in the Training Division and a letter of commendation for assisting deputy U.S. Marshals in apprehending an escapee from the Superior Court cellblock. . . .

[On the day following the statement on Capitol Hill]. I appeared before the Police Department Board of Review for the purpose of determining my suitability for permanent employment with the Police Department. The three members of the Board of Review responded favorably to my interview and told me that they were unanimously recommending that I be converted from a probationary to a regular Police Officer. . . .

71. The affidavit further states:

I have never acted upon any of the opinions I hold or have expressed nor have I encouraged or attempted to influence other members of the Washington Metropolitan Police Department to do so.

72. See text *supra* at notes 22–26.

73. Bruns v. Pomerleau, 319 F.Supp. 58, 65, 66, 69 (D.Md.1970); Brukiewa v. Police Comm'r of Baltimore, *supra* note 22, 263 A. 2d at 218–219; In re Gioglio, *supra* note 22, 248 A.2d at 576. See also Battle v. Mulholland, *supra* note 22, 439 F.2d at 324–325.

74. Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (right to vote); Kramer v. Union Free School Dist., 395 U.S. 621, 627, 629 n. 11, 633, 89 S.Ct. 1186, 28 L.Ed.2d 583 (1969) (right to vote); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel); DeGregory v. Attorney Gen. of New Hampshire, 383 U.S. 825, 829, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966) (right to associate); Sherbert v. Verner, 374 U.S. 398, 406–407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (right to practice religion); Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963) (right to associate); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) (right to associate); NAACP v. Alabama, 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (right to associate).

75. NAACP v. Button, 371 U.S. 415, 438–439, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Thomas v. Collins, *supra* note 31, 323 U.S. at 530, 65 S.Ct. at 320; Lamont v. Postmaster Gen., 381 U.S. 301, 308–309, 85 S.Ct. 1493, 14 L. Ed.2d 398 (1965) (concurring opinion of Brennan and Goldberg, JJ.). See also Tinker v. Des Moines Community School Dist., 393 U.S. 503, 509–514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

76. See text *supra* at notes 24–26.

77. See text *supra* at notes 27–32.

78. Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).

79. See text *supra* at note 54.

80. See text *supra* at note 39.

charge could be justified only by a specific finding that the statements in question adversely affected his efficiency as a police officer or the efficiency of the Department as a police force.[81] That has not been shown by appellees, nor judicially found to be the fact. "[O]nly considerations of the greatest urgency can justify restrictions on speech, and . . . the validity of a restraint on speech in each case depends on careful analysis of the particular circumstances . . . ."[82] If appellant is to be fired, appellees must make a suitable demonstration, and the District Court, following trial, the appropriate determination.[83]

The judgment appealed from is reversed, and the case is remanded to the District Court for further proceedings in harmony with this opinion.

So ordered.

BASTIAN, Senior Circuit Judge, dissenting:

I would affirm the case on the able opinion of District Judge William B. Jones, which is reported at 346 F.Supp. 1247. In my opinion, the Judgment of the District Court should be affirmed without further ado.

So I dissent.

### SUPPLEMENTAL OPINION ON PETITION FOR REHEARING [*]

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellees have presented to us a petition asking that we vacate our ruling herein,[1] and to the full court a suggestion that the case be reheard *en banc*. We find nothing in the petition warranting change in our decision.[2] In the course of considering the suggestion, however, members of the court at large have raised questions as to the intent of our earlier opinion in particular respects. These, in the interest of maximum clarity, we deem it appropriate to address.

We held in part that appellant's dismissal must be reviewed on the basis of his public statements,[3] upon which the Metropolitan Police Department predicated the dismissal,[4] rather than on the basis of his observations during the interview,[5] which the Department utilized merely for "verbal [] reinforce-[ment]" of the "accuracy" of the public utterances;[6] that the dismissal rested on speech, though attributed to an attitude manifested by the content of the speech;[7] and, in consequence, that appellant as a probationary officer was in position to complain of the dismissal,[8] and that the Department had the burden of showing a compelling governmental interest justifying the dismissal because of the speech.[9] The first question is whether that burden can be discharged by proving a material decrease in appellant's efficiency as a police officer—one having that sort of speech-reflected attitude. Our answer is that it surely can.

In our prior opinion, we pointed to "the relationship of departmental discipline, harmony and morale, and as well of individual loyalty and respect, to the proper functioning of a police force",[10] and to the pivotal question whether ap-

---

81. See text *supra* at notes, 55, 72–75.

82. Speiser v. Randall, *supra* note 40, 357 U. S. at 521, 78 S.Ct. at 1339.

83. See Ring v. Schlesinger, *supra* note 31, 164 U.S.App.D.C. at 28–30, 502 F.2d at 488–490. Compare Goldwasser v. Brown, 135 U.S. App.D.C. 222, 417 F.2d 1169 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 918, 25 L.Ed.2d 103 (1970).

\* Senior Circuit Judge Bastian sat as a member of the court during deliberations on the petition for rehearing, but died before the court's order and supplemental opinion were prepared.

1. *Tygrett v. Washington*, No. 72–1876 (D.C. Cir. 1974), hereinafter cited "Op."

2. Senior Circuit Judge Bastian dissented from our holding. *Id.* He also voted to grant the petition for rehearing but died before this supplemental opinion was prepared.

3. See Op. n. 4.

4. Op. text at ns. 42–51.

5. See op. text at ns. 4–9 & ns. 6–8.

6. Op. text at n. 47.

7. Op. text at ns. 27–32.

8. Op. text at ns. 32–41.

9. Op. text at ns. 72–83.

10. Op. text at n. 59.

pellant's public expressions "actually had a deleterious effect on police operations." [11] We recognized, too, that the governmental interest in an efficient police department necessitates consideration not only of the effect of appellant's public remarks on his fellow officers [12] but also on his own performance; [13] we emphasized that the Department would prevail on "a factual demonstration that appellant's statements detrimentally affected his efficiency as a police officer or the Department's efficiency as a police force." [14] The insuperable difficulty in the case at bar, however, is that the District Court like the Department, never properly resolved "[t]he crucial question . . . whether appellant's remarks, in the particular circumstances surrounding them, actually impinged upon qualities making for an effective police force in such manner as to imperil its efficiency." [15]

The second question is whether appellant bore any burden of coming forward with evidence tending to show that the purpose underlying his public declarations was innocuous in terms of the constitutional inquiry. [16] We think that in particular adversarial contexts a discharged employee may well have such a burden, with the overall burden of justification remaining on the governmental employer, but we are satisfied that the question does not properly arise here. Appellant was a probationary officer, and at the administrative level there was no hearing to ascertain cause for dismissal, [17] and consequently no adversary proceeding addressed to the purpose or effect of his public statements. The informal interview [18] focused instead on verifying that the public observations reported in the press as appellant's were in fact made, and on appellant's personal opinions on "sickin" which largely had not been communicated publicly. [19] Similarly, in the District Court there was no trial, and long prior to the grant of appellees' motion for summary judgment appellant filed an affidavit asserting, as earlier he had insisted at the interview, that he had never acted on the opinions he held, or encouraged or attempted to influence other police officers to do so. [20] Our remand for a trial leaves the District Court free to allocate—even to the party not having the ultimate burden of justification—the burden of going forward with particular lines of evidence.

The final question relates to the proper role of summary judgment in this case, and to the scope of evidentiary presentations following remand. Undoubtedly, summary judgment is often appropriate—indeed, ideal—for resolution of issues reviewed on an administrative record, but the obstacles here are severalfold. The administrative record, which primarily is the interview, does not portray the circumstances in which appellant's utterances were made. Beyond that, appellees and the District Court perceived no First Amendment problem, [21] saw no burden of justifying a dismissal traceable to speech, [22] and made no *Pickering* [23] balance or determination. [24] Our remand is for a trial at which these and other administratively-unaddressed matters can be dealt with on an evidentiary record, to which each side, within the usual rules, will be at liberty to contribute.

*Petition denied.*

11. Op. text following n. 59.

12. Op. text following n. 59 to n. 62.

13. Op. text at ns. 72–83.

14. Op. text at n. 72.

15. Op. text at n. 63. See also Op. text at ns. 66–83.

16. See Op. text at n. 60, where we adverted to the possibility that "appellant's statements may have amounted to no more than a lobbying maneuver, instead of a serious exhortation to strike action."

17. See Op. text at ns. 4–11.

18. See Op. text at ns. 4–6.

19. See Op. text at ns. 4–9 & ns. 6–8.

20. Op. ns. 70–71 and accompanying text.

21. See Op. text at ns. 18–26.

22. See Op. text at ns. 22–26.

23. *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), discussed Op. text at ns. 52–62.

24. Op. text at ns. 64–77.