James R. TYGRETT, Appellant

v.

Marion BARRY, Mayor of the District of Columbia, et al.

No. 78–1938.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1979.

Decided March 28, 1980.

Rehearing Denied June 3, 1980.

John W. Karr, Washington, D. C., was on the brief, for appellant.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Acting Corp. Counsel, Louis P. Robbins, Principal Deputy Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellees.

Ralph J. Temple, of the American Civil Liberties Union, Washington, D. C., also entered an appearance for the appellant.

Before J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellant James Tygrett was a probationary police officer when he was fired from the District of Columbia's Metropolitan Police Department (Department).[1] Charging that his discharge had been in violation of his First Amendment rights, Tygrett brought this suit. After a trial on the merits, the district court sustained the Department's action. Because we believe the district court incorrectly applied the law to the facts elicited at trial, we reverse.

## I

Tygrett was fired from the Department in July 1972, shortly before his probationary year was about to end. In the weeks before his firing, Tygrett had become active in efforts by fellow police officers to lobby the Congress for passage of a pending bill that would have increased the pay of police personnel. He took part in several meetings of the local police officers' association, advocating resort to a "sick-in" or "blue flu" as a more effective way of pressing for their demands.[2] Local newspaper reports that Tygrett had made such statements came to the attention of his superiors. They conducted a brief interview with Tygrett during which he acknowledged that he had made the statements attributed to him. Shortly after that, Tygrett received notification from the Department that he was discharged.

This is the second time that Tygrett has appealed his discharge to this court—and the third time this court has expressed itself on the subject. In his complaint Tygrett alleged that his discharge violated his First Amendment rights because, he said, it was occasioned solely by his public advocacy. Tygrett also challenged the constitutionality of the statute and regulation on which his discharge had been based. The district court granted the appellees' motion for summary judgment, *Tygrett v. Washington*, 346 F.Supp. 1247 (D.D.C.1972), and Tygrett appealed to this court.

Relying primarily on *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), this court reversed, and remanded the case for trial. In its opinion, the court set the standard against which the Department's action was to be judged:

[Tygrett's] discharge could be justified only by a specific finding that the statements in question adversely affected his efficiency as a police officer or the efficiency of the Department as a police force. . . . If appellant is to be

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. Appellees here, Marion Barry, the Mayor of the District of Columbia, and Burtell Jefferson, Chief of the Metropolitan Police Department, did not hold these offices when this suit was begun. The term "appellees" will, therefore, be used to refer to the current mayor and chief of police and to their respective predecessors in office.

2. The "sick-in" or "blue flu" has become a metonym for a police bargaining tactic used to circumvent prohibitions against strikes by police officers. If enough officers call in sick simultaneously, the effect is much like that of a strike without technically violating the language of most anti-strike statutes and ordinances.

fired, appellees must make a suitable demonstration, and the District Court, following trial, the appropriate determination.

*Tygrett v. Washington,* 543 F.2d 840, 849–50 (D.C.Cir.1974) (footnotes omitted). The court carefully elaborated the purposes for which it was remanding the case for trial:

[A]ppellees and the District Court perceived no First Amendment problem, saw no burden of justifying a dismissal traceable to speech, and made no *Pickering* balance or determination. Our remand is for a trial at which these and other administratively-unaddressed matters can be dealt with on an evidentiary record . . . . .

*Supplemental Opinion on Petition for Rehearing,* 543 F.2d 850, 851 (D.C.Cir.1976) (footnotes omitted).

Guided by this mandate, the district court afforded Tygrett a full hearing on the merits. The court found that there was not sufficient evidence that Tygrett's statements had affected the efficiency of the Department as a whole. *Tygrett v. Washington,* No. 72–1392, mem. op. at 7 (D.D.C. July 13, 1978) [hereinafter cited as Dist.Ct. Opinion]. The court found, however, that Tygrett's "action [had] impaired and impinged upon his own ability to perform his duties as a police officer." *Id.* at 2. On that basis, the district court sustained the discharge. To provide the background for our discussion of the district court's decision in this case, we briefly set forth the general principles of applicable law.

## II

▮ Among the protections the Constitution provides to all public employees is the right not to be fired for reasons that infringe on First Amendment rights. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Even though public employees may be fired for many reasons— and probationary employees often for no reason at all—such employees may not be discharged merely for speaking out. *See*

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Nonetheless, as the Supreme Court said in *Pickering v. Board of Education, supra,* 391 U.S. at 568, 88 S.Ct. at 1734, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Accordingly, the judicial task is to strike a balance between the interest of the employee in exercising his First Amendment rights and "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* As one guideline for dealing with conflicts of this sort, *Pickering* established that a discharge based on conduct otherwise protected by the First Amendment cannot be sustained unless the conduct impaired the employee's ability to perform his job or interfered with the efficient operation of the agency he served. 391 U.S. at 572–73, 88 S.Ct. at 1736–37.

▮ *Pickering* and its progeny continue to be the meter by which the First Amendment rights of public employees are measured. Whenever a public employee has been discharged for the exercise of his First Amendment rights, "[t]he initial issue . . . is whether there was, in fact, an interference with the efficiency of the public services performed . . . ." *Jannetta v. Cole,* 493 F.2d 1334, 1336 (4th Cir. 1974). Where no such interference is shown, the discharge cannot be sustained. In *James v. Board of Education,* 461 F.2d 566 (2d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972), for example, the court refused to sustain the discharge of a high school English teacher whose only misconduct was wearing a black armband to class in protest of the Vietnam War. *Pickering* required that result, the court reasoned, because the school authorities had made no showing that the wearing of the armband threatened to disrupt any school activities. 461 F.2d at 572. When confronted with firings that implicate a public employee's First Amendment rights,

the courts are required to conduct an individualized and searching review of the factors asserted by the employer to justify the discharge. The purpose of such a review is to assure that those factors have been applied with the deference to be accorded First Amendment rights. *See, e. g., Porter v. Califano,* 592 F.2d 770, 773–74, 779–80 (5th Cir. 1979); *Rosado v. Santiago,* 562 F.2d 114, 117–18 (1st Cir. 1977); *James v. Board of Education, supra,* 461 F.2d at 571–72.

■ That the public employee is a police officer is, of course, one factor to be considered in applying the *Pickering* principles to a particular case. *See Hanneman v. Breier,* 528 F.2d 750, 754 (7th Cir. 1976); *Meehan v. Macy,* 425 F.2d 469, 470–71 (D.C. Cir.1968), *aff'd en banc,* 425 F.2d 472 (D.C. Cir.1969). *See also Kelley v. Johnson,* 425 U.S. 238, 244–46, 96 S.Ct. 1440, 1444–1445, 47 L.Ed.2d 708 (1976). However, that factor does not eliminate the employee's First Amendment rights, nor does it eliminate the need for a meticulous application of the *Pickering* test.[3] In *Hanneman v. Breier,* 528 F.2d 750 (7th Cir. 1976), the court applied *Pickering* to a case involving the disciplining of policemen for disclosing the existence of a confidential internal investigation. The conduct clearly violated an existing and otherwise valid confidentiality regulation. Yet, the court refused to sustain the discharge because the police department did not "show a state interest in confidentiality applicable on these facts which outweighs the public and individual interests in the particular statements made." 528 F.2d at 754.

## III

As a probationary officer, Tygrett had no tenure of office that required protection. He could have been fired from the Department at any time the appropriate official determined that his work was "unsatisfactory," provided that he was given written notification of the reasons for and the effective date of his separation. D.C.Code § 4–105 (1973). Tygrett was sent such a notification in a dismissal letter dated July 7, 1972. Because that dismissal letter provides the only contemporaneous evidence of the Department's actual reasons for firing Tygrett, it is that letter with which our *Pickering* inquiry must begin.[4]

The letter enumerated the following as the basis for the discharge:

That Tygrett was reported by the news media as "advocating that members of [the] Department take part in a 'Blue Flu' or 'Sick Out' as a means of protesting the lack of action by Congress regarding the proposed pay bill for the Police and Fire Departments"; .

That such conduct indicated to the Department an intention to violate the District of Columbia anti-strike ordinance and an actual violation of the corresponding departmental regulation;[5]

3. Some of what Mr. Justice Holmes said in *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 29 N.E. 517 (1892), about the constitutional rights of police officers is still good law: no one has a constitutional right to be a policeman. However, his suggestion that policemen must agree to suspend their constitutional rights in order to keep their jobs has been largely undermined. As the Supreme Court said in *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967), "[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights."

4. The dismissal letter was introduced as a joint trial exhibit and is reproduced in the Joint Appendix (J.A.) at 228–29. It cites the following examples of statements Tygrett was reported to have made:

—"Man, I worked on the Hill for two years. They're scared to death of rallies."
—"If it comes to it, I'm for calling a blue flu."
—"I'm willing to put my job on the line."
—"If this doesn't work, I say go on sick leave."
—"We're going to hold a special meeting and see what other action can be taken. The only action left is a sick-in. I'm for it and if the men want it, I'll organize it."

5. The District of Columbia anti-strike ordinance is contained in the first two paragraphs of D.C.Code § 4–125 (1973), which reads in its pertinent part as follows:

No member of the Metropolitan Police of the District of Columbia shall be or become a member of any organization, or of an organization affiliated with another organization,

That when interviewed by Inspector Robert W. Klotz after the newspaper reports of his statements appeared, Tygrett "verbally reinforced these statements as to their accuracy."

The letter concluded with the statement:

Such conduct clearly indicates that you do not intend to pursue your career as a Police Officer in such a manner as would enhance the image of the Police Department or aid in carrying out its obligations to the community which it serves.

Nothing else of substance was in the letter, nor was there submitted at trial any other contemporaneous evidence casting light on the Department's reasons for firing Tygrett.

■ The Department assigned as its first basis of discharge that Tygrett's conduct indicated an intent to violate the District of Columbia anti-strike ordinance and regulation. The anti-strike ordinance has had a somewhat stormy history. The first paragraph of the ordinance, as originally promulgated, prohibited a police officer in the District of Columbia from becoming a member of any organization which "holds, claims or uses the strike to enforce its demands." This portion of the ordinance was declared unconstitutional, *Police Officers' Guild v. Washington*, 369 F.Supp. 543 (D.D.C.1973), and cannot now be relied on to sustain the discharge.

The second portion of the ordinance prohibits police officers from entering "into a conspiracy, combination, or agreement with the purpose of substantially interfering with or obstructing the efficient conduct or

which itself, or any subordinate, component, or affiliated organization of which holds, claims, or uses the strike to enforce its demands. Upon sufficient proof to the Commissioner of the District of Columbia that any member of the Metropolitan Police of the District of Columbia has violated the provisions of this section, it 'shall be the duty of the Commissioner of the District of Columbia to immediately discharge such member from the service.

Any member of the Metropolitan Police who enters into a conspiracy, combination, or agreement with the purpose of substantially interfering with or obstructing the efficient conduct or operation of the police force

operation of the police force in the District of Columbia by a strike or other disturbance . . . .." Tygrett was not accused of violating this ordinance but rather of indicating such an intent. However, as this court made clear in the first Tygrett appeal:

The First Amendment's Free Speech Clause cannot be laid aside simply on the basis that the speaker was penalized not for his speech but for a state of mind manifested thereby.

543 F.2d at 845 (footnote omitted). Thus, whether the Department could lawfully discharge Tygrett on the ground that his advocacy evinced an unlawful intent was effectively decided on the first appeal. It was not an issue before the trial court and is not an issue before us now.

■ The Department also claimed in its dismissal letter that Tygrett's advocacy was "clearly" in violation of the departmental regulation, which simply tracks the language of the second portion of the anti-strike ordinance. Appellees, however, have not made this argument either to the district court or to us on this appeal. Moreover, the record clearly refutes the factual allegations on which the argument rests. There was neither a strike nor a "conspiracy, combination, or agreement" to engage in a strike or strike-like activity; there was only Tygrett's open advocacy of the euphemistic "blue flu." That is not enough to bring this conduct within the purview of the prohibition, especially in so sensitive an area of law.[6]

in the District of Columbia by a strike or other disturbance shall be guilty of a misdemeanor and upon conviction shall be punished by a fine of not more than $300 or by imprisonment of not more than six months, or by both.

The only relevant part of the regulation referred to in the dismissal letter, M.P.D. General Order No. 1, Ser. 1201 (1971), simply repeats the second paragraph of the ordinance.

6. Because of our resolution of these issues, we need not address the appellant's contention that the second portion of the anti-strike ordinance and corresponding regulation are unconstitutional on their face and as applied.

That leaves as the only contemporaneous evidence bearing on the discharge that paragraph which sets forth as the Department's basis of decision a concern for the "image of the Police Department" and its capacity for "carrying out its obligations to the community." Since such vague phrases are not enough in and of themselves to justify the Department's action toward Tygrett, *cf. Muller v. Conlisk*, 429 F.2d 901 (7th Cir. 1970), an effort was required to ascertain what this language meant. Testimony at trial revealed that the Department meant something quite different from what it said.

When asked at trial what he had thought at the time of the discharge would be the harm to the Department of Tygrett's statements, Chief Wilson replied:

> I perceived the danger that others might make similar statements and that others might be led to follow his essential call for a conspiracy to engage in what was a violation of the law, like conspiracy to obstruct the efficient operation of the Department through a blue flu, strike or similar action.

Tr. 76. When Chief Wilson was then asked why he took the action he did, he replied, "[T]o avoid a blue flu strike . . . ." *Id.* Chief Wilson also testified that Tygrett's statements "had, in [his] view, the potential for leading other officers to take the view that so-called 'blue flu' or 'sick-in' was an appropriate course of action, and had the potential for leading to a conspiracy to engage in blue flu or similar quasi-strike action . . . ." Tr. 63. In short, the Department's firing of Tygrett was motivated by a concern for how others would react to what Tygrett had said.

Because our previous opinion had adopted impairment of departmental efficiency as one of two valid justifications for discharge, the district court offered the Department every opportunity to come forward with evidence that the reactions of other police officers to Tygrett's statements would impair Department efficiency. *E. g.,* Tr. 53–58. None of these efforts bore fruit. Tr. 303. The district court thus properly concluded that there was no satisfactory evidence that Tygrett's statements actually adversely affected departmental efficiency. Dist.Ct. Opinion at 7. Since the Department did not carry its burden of proof, the discharge could not be sustained on that ground.

The district court then considered the second of the two valid justifications for the discharge, namely, whether Tygrett's statements had impaired his own effectiveness as a police officer. Because it concluded that Tygrett's advocacy of the "blue flu" had had that effect, and because it construed the documentary evidence as "establish[ing] by reasonable inference" that a concern for that effect had motivated the Department's decision, the district court sustained the Department's firing of Tygrett. Dist.Ct. Opinion at 10–12. In our view, however, *Pickering* required the trial court to have more carefully addressed what actually was, not what, "by reasonable inference," might have been.

### IV

The district court's analysis was premised on the proposition that "blue flu" is a euphemism for the concerted action of police officers falsely reporting to their superiors that they are too ill to perform their assigned duties. Dist.Ct. Opinion at 3. By his public advocacy of such a tactic, the district court reasoned, Tygrett put his own reputation for truthfulness in question. The district court noted that a "good reputation for truthfulness is essential to the ability of a police officer to perform efficiently and effectively his many testimonial duties." *Id.* at 8. It thus concluded that by advocating the "blue flu," Tygrett had "seriously impaired" his credibility and thereby "diminished his personal efficiency to perform at least one of a police officer's principal duties; testifying as a government witness before courts, magistrates, and juries." *Id.*

Whatever the cogency of this reasoning, there simply was no direct evidence that a concern for Tygrett's credibility was ever considered by the Department as a reason

for its action.[7] It is not possible to construe the dismissal letter as encompassing such a rationale. The letter does not speak of lying, or testimony before juries, or impairment of credibility. It talks of strikes and images and community obligations.

There is, an addition, a telling absence from the record of any corroborating evidence. Not only is there no reference in the dismissal letter to this putative flaw in Tygrett's personal efficiency, but there is evidence in the record that contradicts it. As a probationary officer, Tygrett was subject to evaluation by the Sergeants Board of Review. Shortly before his discharge, he had one such evaluation and was recommended for permanent appointment. Tr. 146. Several years after the discharge, an employment reference letter was sent by the Department to another city's police department.[8] That letter mentions the controversy and circumstances of Tygrett's discharge but says nothing about his truthfulness or lack thereof.

■ If the *Pickering* approach to the complicated issue of freedom of speech for public employees is to have any vigor, judicial review for the discharge must be addressed solely to contemporaneous considerations. Absent the complicating factor of constitutionally protected conduct, a public employee can be discharged for a variety of reasons, and a probationary employee for even gossamer causes. That being so, any kind of reconstruction of the reasoning behind the discharge that provides the employer with a post hoc justification for its action cannot be allowed. To permit that kind of judicial "review" would eviscerate *Pickering*'s effort to prevent the state from using its control over a person's job to penalize its employees for the exercise of their First Amendment rights. Therefore, it is essential, as Judge Leventhal said in an analogous case, that the court reviewing the discharge restrict its focus to "the reasons given by the [employer] and not on reasons that may come to light if and when a court rummages throughout the record in an effort to reconstruct on what basis the [employer] might have decided the matter." *United States ex rel. Checkman v. Laird*, 469 F.2d 773, 783 (2d Cir. 1972). This principle is particularly appropriate in the present case, for there is a statutory requirement that the governmental agency give written reasons for the decision under review. *See* D.C.Code § 4–105 (1973).

■ The appellees argue that the Department should not be bound by its failure to use some proper legal passwords in its letter of dismissal. We agree. In a case like this, it was appropriate to allow the Department to offer evidence elaborating what it meant by the words it used. *Cf. Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). That opportunity was amply afforded the Department by the district court. Nevertheless, there must be some relationship between what was said and what was meant. Such a relationship is non-existent here.

■ In effect, the appellees would invite this court to "rummage[ ] throughout the record" to reconstruct a rationale for the firing that the Department never actually entertained. This we cannot do. Judged solely on those factors that the Department actually considered in coming to its decision, there was no lawful basis on which its action could have been upheld. As the record affirms throughout, Tygrett was discharged because he advocated strike actions, not because he lied. Because the only lawful ground on which the discharge might have been justified was constructed

---

7. To adopt this approach is not necessarily to accept the reasoning of the district court. Mere advocacy of the "blue flu" tactic is not quite synonymous with perjury under oath. For better or worse, the "blue flu" has grown to be a strike-substitute that is to some extent, however grudgingly, tolerated by society. Not every police officer who threatens or engages in the "blue flu" is treated as a pariah. Accordingly, to reason from the premise that one has advocated the "blue flu" to the conclusion that one has thereby "seriously impaired" one's ability to function as a police officer can be questioned.

8. Plaintiff's Exhibit No. 7, *reproduced at* J.A. 244–45.

after the fact, this discharge cannot be sustained.[9]

As the Supreme Court has reaffirmed since *Pickering*, public employees do not forswear the protections of the Constitution simply by swearing to uphold the Constitution. Public employers are fully justified in protecting the integrity of their work force and in maintaining the efficiency of individual employees; but such legitimate missions cannot be used as an excuse to rid their work force of an employee simply because he has exercised the rights guaranteed by fundamental law. In each case, reviewing courts must set what was done in the context of contemporaneous events and reasons, to make sure that a true balance is struck between the responsibilities of public employers and the rights of their employees. Applied to this case, that process clearly precludes judicial sanction of the action taken against Tygrett.

The judgment is reversed and the case remanded to the district court to fashion such relief as in its discretion is appropriate.

*It is so ordered.*

---

9. Because the evidence is clear that the only blemish on Tygrett's record at the time of his firing was his advocacy of the "blue flu," the Department could not, and does not, claim that it would have fired him anyway for some other reason. That being so, the principles set down by the Supreme Court in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and reaffirmed in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), do not apply to the present case. In *Mt. Healthy*, a non-tenured teacher was denied renewal of his contract on the basis of two distinct incidents. One involved conduct clearly protected by the First Amendment; the other, clearly not. In that situation, the Court held that the school board's action was to be sustained if the board could show by a preponderance of the evidence that "it would have reached the same decision . . . even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576. This contrasts sharply with the present case, for the Department's decision to fire Tygrett was based on protected conduct, and nothing else. There is therefore not the slightest possibility that the Department "would have reached the same decision . . . even in the absence of the protected conduct."