# Grievance of Charles T. Morrissey

[538 A.2d 678]

No. 84-251

Present: Allen, C.J., Hill, Peck and Gibson, JJ., and Barney, C.J. (Ret.),
Specially Assigned

Opinion Filed December 4, 1987

*David Putter* and *Norman E. Watts, Jr.*, Law Clerk (On the Brief), of *Putter & Unger Associates*, Montpelier, for Plaintiff-Appellant.

*Jeffrey L. Amestoy*, Attorney General, *Marilyn Signe Skoglund*, Assistant Attorney General, and *Frances C. Lindemann*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellee.

**Gibson, J.** On May 25, 1983, Charles Morrissey was dismissed from his post as editor of *Vermont Life* magazine. The dismissal was precipitated by published interviews in which he was critical of his superior, a co-worker, and a recent reorganization of the magazine's operating structure. Morrissey filed a grievance with the Vermont Labor Relations Board (Board), which made extensive findings of fact and dismissed the grievance. This appeal followed, and we affirm the Board's decision.

Three primary issues are presented on appeal: whether grievant was afforded sufficient notice of the grounds for his dismissal, whether the dismissal was supported by just cause, and whether the dismissal violated grievant's free speech rights under either

state or federal constitution. We will address each of these issues after a review of the facts found by the Board.

Grievant's tenure at *Vermont Life* began in October of 1981, when he was hired as acting editor. He became editor-in-chief in January of 1982, assuming responsibility for planning, coordinating, and directing all aspects of the magazine. As a managerial employee, he did not have the contractual rights enjoyed by most state employees, but the parties agree that he could be dismissed only for cause. *Vermont Life* is a division within the Agency of Development and Community Affairs (the Agency), and the secretary of the Agency was grievant's only immediate superior.

In the fall of 1982, Arthur Kreizel, then secretary of the Agency, made plans to create a new position at *Vermont Life*, carrying the title of publisher. The publisher was to have marketing and promotion duties, and it was hoped that this individual would be able to reduce the magazine's operating deficit. Grievant was favorable to this idea in principle. Problems developed, however, when Kreizel decided upon instituting a "co-equal concept," under which the editor and the publisher would have equal authority and would report directly to the secretary. Both grievant and the Senior Board of Editors, an advisory body for the magazine, were adamantly opposed to the co-equal concept. Nevertheless, the Agency and the Department of Personnel began to solicit applications for the publisher's position in the late fall of 1982.

In January of 1983, Milton Eaton became secretary of the Agency, inheriting both the newly created publisher's position and the co-equal concept. The magnitude of the developing problems became clear at a subsequent meeting of the Senate Appropriations Committee, scheduled for February 8, 1983, at which Eaton and grievant were requested to appear. Shortly before the hearing, Eaton held a staff meeting, which grievant attended, and requested briefing on matters that might be brought up. Earlier, grievant had spoken with a state senator on the Committee and had provided her with a series of prepared questions concerning the publisher's position at the magazine. Despite Eaton's request for briefing, grievant did not inform him of the prepared questions.

At the Committee meeting, the senator asked grievant several of the questions he had provided her. Grievant testified, in response, that his job description placed him in charge of *Vermont Life* and that he had "no reason to assume any change in that

arrangement." The senator asked Eaton only whether the senior editors' role would be usurped by that of the publisher, and Eaton replied in the negative. After the Committee hearing, Eaton reprimanded grievant for his performance, telling him that he was not being a team player, that he knew that the co-equal concept had been established, and that Eaton would not tolerate such behavior in the future.

A few weeks after this incident, Eaton scheduled a round of interviews with candidates for the publisher's position. Grievant asked to be a part of the interviewing panel, but Eaton felt that such a role would be inappropriate. Eaton did tell grievant that he wanted his advice regarding the candidates for the position, however. After the initial round of interviews, the panel selected three finalists and designated Leslie Parr as their unanimous first choice. Eaton sent the applications and resumes of the three finalists to grievant on February 28 and requested that he provide his input. In a news article appearing a week later, Eaton was quoted as saying that grievant would "be involved in the final decision" regarding the hiring of the publisher.

Some time later, Eaton still had not heard from grievant about the three finalists, and he had several telephone calls placed to him. Receiving no reply, he asked the Agency's personnel officer to contact grievant in an attempt to obtain his input. This officer's efforts to reach grievant by telephone were also unsuccessful.

Leslie Parr was hired as the magazine's new publisher on March 18, 1983, and grievant met her for the first time on that same day. On March 19, still without having communicated with Eaton on the matter, grievant sent a memo to the senior editors in which he stated that he was afraid "the wrong person has been hired." Just before Parr began work at the magazine, Eaton had a brief meeting with the *Vermont Life* staff in order to explain the organizational structure. Eaton discovered that no preparations had been made for Parr's arrival and that grievant expected her to work in a cubicle outside his office. Eaton requested that a separate office be prepared for Parr. The meeting was otherwise perfunctory, with few questions asked by the staff and no questions asked by grievant. After Eaton left, the staff held what grievant called a "wake" to mark the supposed end of editorial control of the magazine.

Parr began as publisher on April 11, 1983, and she was forced to work in the cubicle initially because no office had been prepared for her. From her first day at the magazine, Parr sought to meet privately with grievant in order to discuss their respective roles and to establish a cooperative relationship. Despite Parr's requests, however, grievant never met privately with her. He also failed to respond to her repeated suggestions that regular staff meetings should be established.

On May 10, a full month after Parr had begun work at the magazine, grievant finally agreed to a meeting. When she entered his office, she found that one of grievant's assistants was already present, precluding any discussion of sensitive topics. Instead, grievant told Parr that he had been promised an interview, and he began to question her about her experience and background, asking if she really felt qualified for the publisher's position. He then brought out Parr's job application and resume and proceeded to question her as if she were applying for the position. Grievant's manner was generally hostile and confrontational.

The following day, grievant asked Parr to attend another meeting in his office. On this occasion, four other staff members were present. All of these employees expressed anger at Parr, and one of them accused her of being an "agent" for the Agency. Grievant again attempted to interview Parr for the position, and Parr responded by stating that she would not be interviewed. Finally, grievant asked Parr if she were planning to return to New York and the meeting ended. Parr sent a memo to grievant the next day, May 12, in which she commented on the inappropriateness of the meeting. She stated that grievant had undermined her relationship with the staff members and had damaged morale, but she expressed hope that she and grievant could "overcome this division and begin to work together." Secretary Eaton was absent during this period of time, having left on a business trip to the Far East in late April.

On May 18, grievant invited a reporter for the *Burlington Free Press* to interview him about *Vermont Life* issues, knowing that the interview would be the basis for an article. Grievant discussed Parr's qualifications with the reporter and told him that her lack of direct magazine experience had become apparent. He also provided the reporter with a copy of Parr's May 12 memorandum. He stated that morale at the magazine had been damaged and that he was considering resignation. He recounted his opposition

to the co-equal concept and told the reporter that he had suggested to Parr that she consider trying to salvage the situation by returning to New York. Finally, grievant stated that Eaton had promised him input regarding the selection of the publisher and that Eaton had not acted on that promise.

An article appeared on the front page of the *Free Press* on the following day, reporting grievant's comments and including the substance of Parr's memo to grievant. The article also repeated grievant's statement that Eaton had promised him a role in the hiring decision but that Eaton had "reneged." In addition, grievant talked to a reporter for the Barre-Montpelier *Times Argus* and told him that a crisis existed at *Vermont Life*, that Parr should return to New York, and that *Vermont Life* already had the State of Vermont as a publisher. These comments appeared in an article in the *Times Argus*, also on May 19. Grievant still had not discussed any of these issues with Eaton, and he had not discussed them privately with Parr. When Parr read the articles, she felt that they ended any possibility of cooperation between grievant and herself.

Eaton returned from his trip to the Far East on May 25, 1983. After speaking to members of his staff, and after reviewing Parr's work diary, her memo to grievant, and the newspaper articles, Eaton decided to meet with grievant that afternoon. He prepared a letter of dismissal, having decided that grievant should be removed from his job unless he could show circumstances mitigating his actions.

The meeting took place that same afternoon, and Eaton began by referring to the newspaper articles and asking for grievant's explanation. Grievant admitted that he had erred in using the media to vent his frustration. He stated that Parr was incompetent and reiterated his opposition to the co-equal concept. When Eaton asked whether grievant had cooperated with Parr, he replied that he had wanted to cooperate initially but that Parr could not "hack it." Grievant did not attempt to make amends, and he offered no suggestions for resolution of the problems discussed. Eaton stated that grievant was not a team player and was guilty of insubordination and unprofessional conduct. He asked for grievant's resignation, but grievant requested time to consult a lawyer. About an hour later, grievant returned to Eaton's office and refused to resign. Eaton then signed the dismissal letter and gave it to grievant. The relevant portion of the letter stated:

The situation as it currently exists threatens the effective operations at *Vermont Life*. Your unwillingness to accept and cooperate with the person duly selected to fill the Publisher's position has seriously jeopardized the stable operation of the organization. While I do not quarrel with your right to disagree with actions taken by the Legislature or the Agency, as Editor of *Vermont Life* you nevertheless have an obligation to labor conscientiously for the success of the organization after decisions are made. This you have failed to do.

In addition, your failure to work towards resolving our philosophical differences in a professional manner lead me to the conclusion that your dismissal is warranted.

Grievant filed a grievance with the Board on June 23, 1983, contending that the dismissal violated both procedural and substantive rights. He alleged that the dismissal letter failed to state specifically the basis for the dismissal, that the dismissal was effected without just cause, and that the dismissal was an impermissible retaliation for grievant's exercise of his right to free speech.

During the prehearing proceedings, the State filed an amended answer that elaborated upon the official grounds for the dismissal. First, the State emphasized that it intended to rely upon grievant's actions before and during the Senate Appropriations Committee hearing as a specific item of misconduct. Second, the State included an extensive analysis of general charges against grievant in support of the dismissal. The board accepted the amended answer and incorporated it into its findings and analysis.

In his testimony before the Board, Eaton characterized the publication of the two newspaper articles as the "straw that broke the camel's back." The Board found that Eaton would not have fired grievant on May 25 and might not have dismissed him at all if the articles had not appeared. But the Board also found that grievant's job had been in jeopardy before the articles were published because of his prior conduct.

The majority of the Board concluded that the State had proved its charges against grievant in four areas: insubordination, failure to accept the Agency's decision to establish a publisher's position vested with authority equal to the editor's, refusal to cooperate with the publisher, and detrimentally affecting working relation-

ships and the efficient operation of the magazine. On the other hand, the Board also concluded that Eaton himself had contributed to the deterioration of the situation at *Vermont Life.* With the exception of one staff meeting, Eaton did nothing to ease the transition between the old system and the new, and he did nothing to bring the editor together with the new publisher. The Board found that Eaton's "hands off" policy was intended to place full responsibility on grievant, giving him "the rope with which to hang himself." Nevertheless, the Board concluded that Eaton's dismissal of grievant was both justified and procedurally valid.

## I.

Our analysis begins with a review of several procedural aspects of the dismissal. Relying upon the due process guarantees of both state and federal constitutions,[1] grievant argues that he was not given advance notice that the behavior charged could lead to dismissal, that he was not provided with adequate notice of the specific grounds for his discharge, and that his termination should not have been affirmed on grounds that were cited only after the grievance was filed.[2] We disagree.

In *In re Brooks,* 135 Vt. 563, 382 A.2d 204 (1977), this Court held that a discharge for cause will be upheld only if, among other things, the terminated employee had fair notice, express or fairly implied, that engaging in the conduct charged

---

[1] In *In re Muzzy,* 141 Vt. 463, 449 A.2d 970 (1982), we noted that the state's collective bargaining agreement, which requires "just cause" for termination, vests employees with a property interest in continued employment, thereby implicating due process considerations. *Id.* at 472, 449 A.2d at 974. Here, grievant was not covered by that agreement, but he was covered by a letter of understanding, dated July 25, 1981, from the Department of Personnel. This letter sets forth the rights extended to all managerial employees, and it provides that managers can be dismissed only for cause. The State does not argue that due process guarantees are inapplicable.

[2] Grievant also argues that he was entitled to a pretermination hearing, relying upon *Cleveland Bd. of Educ.* v. *Loudermill,* 470 U.S. 532 (1985). This issue was not raised below, probably because the Board hearing predated *Loudermill.* We believe that it would be inequitable here to impose *Loudermill's* requirement of a pretermination hearing retroactively. See *Chevron Oil Co.* v. *Huson,* 404 U.S. 97, 107 (1971). In any event, we note that Eaton's meeting with grievant provided grievant with the requisite "opportunity to respond prior to termination." *Loudermill,* 470 U.S. at 544.

could lead to dismissal. *Id.* at 568, 382 A.2d at 207-08. Here, the Board concluded that grievant had such notice because he knew that he was duty-bound to cooperate with the publisher, to work conscientiously for the magazine's success, to inform Eaton of the essentials concerning the magazine, and to be loyal to Agency policies and superiors. But grievant focuses on two aspects of the conduct leading to his discharge: his undisclosed preparation of leading questions for a member of the Senate and his statements in the newspaper articles. Because previous editors of *Vermont Life* have enjoyed the prerogative of communicating directly with members of the legislature and with representatives of the news media, he contends that he had no fair preconduct notice that he could be discharged for these same activities.

Grievant first attacks the Board's finding that, although past editors had generated news stories in a similar manner, no evidence showed that these articles had included criticism of the secretary's management policies. He directs our attention to testimony by two former editors regarding their use of the press, and he maintains that the Board's finding on this point is clearly erroneous. Some of the cited testimony, however, refers to actions taken not by past editors, but by members of the Senior Board of Editors, an advisory body. The key testimony, by a former editor, makes clear that he would not have considered approaching the press concerning a policy disagreement without first discussing the matter with the secretary and that he would refrain from any discussion that would "jeopardize the magazine or embarrass the State." Other evidence concerned an incident where the press was contacted regarding a one-time expenditure of *Vermont Life* funds for advertising by the State's Travel Bureau. This testimony referred to criticism of a single transfer of funds, rather than an established management policy, and the Board's finding is not clearly erroneous.

Nevertheless, grievant urges that he was not warned prior to approaching the state senator and the press that his traditional prerogatives in these areas had been revoked. Grievant was not dismissed merely for lobbying a legislator or for speaking to members of the press, however; instead, as the Board noted, his discharge followed a deliberate embarkation upon "a course of conduct calculated to subvert an Agency policy." In *Brooks*, we stated that "the ultimate question for the Board is whether the conduct was or should have been known to the employee to be

prohibited by the employer." *In re Brooks*, 135 Vt. at 568, 382 A.2d at 208. Here, the Board concluded that grievant's covert preparation of questions for the senator was "gravely insubordinate," especially in light of his failure to disclose his actions upon a direct request for briefing by his superior. Even absent explicit interdiction, grievant should have known that disloyal conduct was proscribed. After this incident, Eaton reprimanded grievant for not being a team player, told him that he· knew the co-equal concept had been established, and informed him that similar behavior would not be tolerated in the future. This statement provided clear notice, prior to grievant's solicitation of the newspaper interviews, that similar conduct with the news media was forbidden. In sum, we conclude that grievant had ample preconduct warning that his actions and omissions could result in dismissal.

Grievant turns to the dismissal letter itself, contending that it failed to identify specific acts or omissions as bases for his discharge. He concedes that a contemporaneous oral notification accompanied the letter, but he maintains that this statement was also impermissibly vague. The Board ruled only that a written notice of dismissal, required for nonmanagerial employees, was not mandated here.

■ Due process considerations require that a notice of dismissal be sufficiently specific to allow adequate preparation for the employee's defense. *Long* v. *Department of the Air Force*, 683 F.2d 301, 302 (9th Cir. 1982). Such notices are not measured against the standards imposed upon criminal indictments, however. *Baughman* v. *Green*, 229 F.2d 33, 34 (D.C. Cir. 1956). Here, the dismissal letter noted grievant's unwillingness to accept and cooperate with the new publisher, his failure to labor conscientiously for the success of the magazine after the co-equal concept had been decided upon, and his failure to work towards resolution of the philosophical differences between himself and Eaton. These matters were discussed in a meeting with Eaton, during which grievant was reprimanded for his use of the newspaper interviews. Eaton stated that grievant had been insubordinate and unprofessional and told him that he was not a team player.

■ At no time did grievant seek a more definite statement of the charges, nor has he alleged that he was unable to prepare for defending against them. We conclude that the dismissal letter, in combination with the contemporaneous oral notification, ex-

tended notice of adequate specificity to grievant. See *Brasslett* v. *Cota*, 609 F. Supp. 948, 968 (D. Me. 1984) (incident not mentioned in dismissal letter but discussed with terminated employee held to justify discharge), *rev'd on other grounds*, 761 F.2d 827 (1st Cir. 1985).

The final assignment of procedural error relates to the State's elaboration of the reasons for the discharge in its amended answer. The State submitted the amended answer as notice of its intent to rely upon the incidents occurring before and during the legislative committee hearing as additional evidence of misconduct. Grievant contends that the Board erred by relying upon the "new charge" in affirming the discharge because it was incorporated only after the grievance was filed. We disagree.

We have already noted that, in the absence of statutory or contractual requirements, due process considerations as to charging procedures revolve around adequate notice. If the terminated employee is informed of the grounds for the discharge in a manner timely and specific enough to allow adequate preparation of his defense, then due notice has been rendered. Here, the State's amended answer notified grievant over a month before the hearing that the incident involving the legislative hearing would be raised and relied upon. Grievant did not request a continuance, and the matter was fully explored during discovery proceedings and fully litigated.

Grievant observes correctly, however, that this is not an ordinary case. Where a public employee appeals a discharge based, in part, upon public speech activity, judicial review of the discharge "must be addressed solely to contemporaneous considerations." *Tygrett* v. *Barry*, 627 F.2d 1279, 1286 (D.C. Cir. 1980). This rule prevents post hoc justification of the discharge on grounds independent of the protected activity. Grievant argues that the Board's acceptance of the State's amended answer permitted this type of retroactive reconstruction of the rationale underlying the dismissal. But the *Tygrett* court made clear that the "contemporaneous considerations" restriction does not bind the public employer absolutely to the words used at the time of the dismissal. Instead, the employer is allowed "to offer evidence elaborating what it meant by the words it used." *Id.* On the other hand, "there must be some relationship between what was said and what was meant." *Id.*

*Tygrett* involved the discharge of a police officer who had been advocating "sick-in" strike techniques among his fellow officers. The Court of Appeals rejected an attempt to justify the discharge on grounds of diminished personal efficiency and credibility where the required dismissal letter spoke only of his impact upon the police department's public image and its ability to meet community obligations. The court found it impossible to construe the dismissal letter as encompassing the personal credibility rationale and noted evidence contradicting this rationale in the record.

Here, in contrast, the dismissal letter detailed grievant's resistance to the co-equal concept and his failure to work towards resolution of the philosophical differences between himself and Eaton. Eaton extended a contemporaneous oral notification that grievant had been insubordinate and unprofessional, and had failed to function as a team player. In its amended answer, the State offered its account of the incident involving the state senator as "simply a factual example" of the charges outlined in the letter and in the discussion with Eaton. Unlike the situation in *Tygrett*, we find a direct relationship between "what was said and what was meant"; the incident with the senator was a contemporaneous consideration with respect to the discharge, and the Board's reliance upon it was not in error.

## II.

The substance of the grounds for dismissal must also be examined because grievant contends that his discharge cannot be upheld under the doctrine of just cause. He maintains that the conditions leading to his dismissal were knowingly created and aggravated by Eaton and the Agency, and he argues further that Eaton and other officers deliberately refrained from carrying out their duties to assist him and to correct his inadequate performance. Urging that such behavior violated his contract of employment, grievant suggests that the Board erred in finding just cause for the dismissal. We disagree.

Whether a discharge is based upon just cause depends on whether it is objectively reasonable to impose the sanction of dismissal in light of the misconduct charged. *In re Brooks*, 135 Vt. at 568, 382 A.2d at 207. We believe that, here at least, grievant's focus upon the behavior of his superiors is misguided. While an employer's bad faith or negligence may be one factor in a just

cause determination, the analysis should center upon the nature of the employee's misconduct. Whatever the failures of grievant's superiors, their actions did not license him to undermine established policies of the magazine.

In response to a related argument, the New York Court of Appeals has held that acts done in defense of an employee's contractual rights or in assertion of an agreed-upon status or role are not insubordinate. *Rudman* v. *Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 280 N.E.2d 867, 872, 330 N.Y.S.2d 33, 40 (1972). *Rudman* involved the discharge of an individual who had been hired as editor of a publishing company division. Instead of being "in over-all charge of major editorial decisions" as contemplated under the terms of the employment contract, however, the individual's status was effectively reduced to that of a writer, supervising no one and subject to the supervision of other titular editors. The *Rudman* court opined that, under these circumstances, the employee's refusal to perform was not insubordinate. *Id.* at 12, 280 N.E.2d at 872-73, 330 N.Y.S.2d at 42.

Here, in contrast, grievant was neither standing upon contractual rights nor engaging in an aboveboard protest of a reduction in rank. Although he may have been concerned about a potential erosion in editorial control, he never discussed this concern with Eaton. Instead, he actively engaged in attempts to undermine established Agency policy and his superior's authority. This is the very type of "substantial shortcoming detrimental to the employer's interests . . . which the law and a sound public opinion recognize as a good cause for his dismissal." *In re Brooks*, 135 Vt. at 568, 382 A.2d at 207. We hold that, any failures of his superiors notwithstanding, grievant's discharge was based upon just cause.

Grievant next questions the factual underpinnings of the grounds for the dismissal, arguing that the evidence and findings do not establish misconduct at the legislative hearing or the charge that he publicly accused Eaton of lying. Our review of the record revealed evidentiary support for each of these charges. It is of little import that the newspaper article used the word "reneged" rather than the word "lied" in quoting grievant regarding Eaton's promise to obtain input from grievant on the hiring of a publisher. The crux of the charge is that grievant falsely impugned his superior's credibility in a public forum, and the evidence supports the Board's findings and conclusions on this point. Moreover, we observe that these are but two of the variety

of allegations of misconduct brought against grievant, forming only part of the basis for the formal charges of insubordination and lack of cooperation. In sum, we hold that the charges are supported by the evidence and that the Board's conclusions are supported by its findings.

## III.

Perhaps the most important issue presented by this case is whether grievant's discharge violated his fundamental rights to freedom of speech. Grievant contends that the Board erred by affirming his dismissal on grounds that involved his communication with the press and the legislature because, he urges, these communications pertained to matters of public concern and were protected by both the federal and state constitutions. Although we agree that grievant's speech conduct warrants constitutional protection, we conclude that his dismissal was justified nonetheless.

■ The Board's opinion and the arguments of the parties reveal some confusion regarding the proper approach to problems involving a public employee's First Amendment rights. In *Pickering* v. *Board of Educ.*, 391 U.S. 563 (1968), the United States Supreme Court made clear that an individual accepting public employment does not lose his First Amendment right to comment on matters of public interest, even where those matters involve the institution in which he is employed. *Id.* at 568; *Rankin* v. *McPherson*, ___ U.S. ___, 107 S. Ct. 2891 (1987). "On the other hand, public employers do not lose their ability to control behavior and speech in the workplace merely because they are governmental bodies subject to the restraints of the First Amendment." *Yoggerst* v. *Hedges*, 739 F.2d 293, 295 (7th Cir. 1984).

■ As in other contexts, the public employee's First Amendment right is not absolute: "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.[3] The reviewing court should consider, among other

---

[3] The court cautioned further, in *Mt. Healthy Bd. of Educ.* v. *Doyle*, 429 U.S. 274 (1977), that a public employee's exercise of his free speech rights should not insulate him from employment decisions based upon other grounds. Rejecting a rule that would invalidate public employment terminations based in "substan-

things, whether the employee's conduct impairs discipline, harmony among co-workers, close working relationships, the speaker's performance of his duties, or the regular operation of the institution. *Id.* at 570-73.

The *Pickering* balancing analysis was elaborated upon in *Connick* v. *Myers*, 461 U.S. 138 (1983). *Connick* involved the dismissal of an assistant district attorney who, in reaction to a pending transfer, circulated an intra-office questionnaire regarding official transfer policy and other matters. Upholding the dismissal against a First Amendment claim, the Court emphasized that the *Pickering* balance requires "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150. The Court set up a two-step process for deciding whether an employee's discharge on the basis of speech activities can be upheld under the First Amendment.

The threshold inquiry under *Connick* is whether the employee's speech conduct can "be fairly characterized as constituting speech on a matter of public concern." *Id.* at 146. If not, then "it is unnecessary . . . to scrutinize the reasons for [the employee's] discharge. . . . [G]overnment officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* Whether an employee's speech conduct addresses a matter of public concern is determined by an evaluation of its content, form, and context, as revealed by the whole record. *Id.* at 147-48. Here, the question is a close one because the circumstances of grievant's speech conduct included strong elements of personal interest, and "speech in the public interest by a public spirited citizen is entitled to

---

tial part" on an exercise of protected conduct, the Court outlined a three-part test of causation designed to "protect[] against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights." *Id.* at 287. First, the employee has the burden of showing that his conduct is constitutionally protected; second, the employee must demonstrate that the conduct at issue was a substantial factor in the termination decision; and, finally, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of the protected conduct. *Id.*

We forego the causal analysis employed in *Mt. Healthy* because we believe that grievant established the requisite causal connection between his speech conduct and the discharge. The Board erred in this respect, but we uphold its decision on other grounds.

greater protection than speech in the interest of the speaker
. . . ." *Joyner* v. *Lancaster*, 815 F.2d 20, 23 (4th Cir.), *cert. de-nied*, ___ U.S. ___, 108 S. Ct. 102 (1987). "[T]he First Amendment does not require a public office to be run as a roundtable for em-ployee complaints over internal office affairs." *Connick*, 461 U.S. at 149. For purposes of analysis, however, we adopt the Board's conclusion that grievant's criticisms of the co-equal concept and of the new publisher's qualifications constituted speech on mat-ters of public concern.

If the employee's speech touches upon matters of public con-cern, then his interest in the speech activity must be balanced against the government's interest in maintaining efficiency and discipline. The task is a difficult one because the government's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. *Id.* at 150. If the em-ployee is engaged in whistleblowing activities, for example, then the government's interest in avoiding office disruption would not be afforded much weight in the balance. See *Monsanto* v. *Quinn*, 674 F.2d 990, 996 (3d Cir. 1982) (citing *Porter* v. *Califano*, 592 F.2d 770, 773-74 (5th Cir. 1979)).

*Connick* proceeds by outlining several important factors to be considered in weighing the government's interest. First, "[w]hen close working relationships are essential to fulfilling public re-sponsibilities, a wide degree of deference to the employer's judg-ment is appropriate." *Id.* at 151-52. The government's burden of proof will vary depending on the nature of the speech at issue, but the employer is not required to await actual disruption of the office or the destruction of working relationships before discharg-ing the offending employee. Second, the time, place, and manner of the employee's speech conduct is also relevant. *Id.* at 152. For example, an employee who confronts his immediate supervisor personally or who exercises his speech rights at the office poses a special threat to institutional efficiency. Finally, the context of the underlying dispute is also significant. *Id.* at 153.

The facts of the instant case lead to the conclusion that griev-ant's interest in this particular exercise of his right to free speech was outweighed by the State's interest in the efficiency of *Ver-mont Life* operations. His published remarks, including the accu-sation that Eaton had reneged on a promise and the suggestion that the publisher should return to New York, undoubtedly de-stroyed any remaining vestiges of professional rapport between

grievant and these close co-workers. The publisher testified before the Board that she felt humiliated and resentful because of the articles and that they ended any possibility of cooperation with grievant. Grievant himself testified that members of his staff were concerned and regretful about the appearance of the articles and that he viewed the publication of the articles as a serious occurrence for *Vermont Life.*

The time and manner of grievant's speech conduct also weighs in favor of the State. Grievant initiated the interviews after the co-equal policy had already been implemented and at a time when Eaton was in the Far East and could not react immediately to repair the damage done. Moreover, grievant was not simply responding to a news reporter's queries; rather, he actively solicited the interviews as part of his attempt to undermine Agency policy and his superior's authority.

The context of the speech conduct here is also helpful in striking the balance. "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." *Id.* Grievant's solicitation of the newspaper interviews and his remarks in those interviews were a direct reaction to the implementation of the co-equal concept, a policy that had a substantial impact upon grievant personally. Accordingly, Eaton's perception that grievant had "seriously jeopardized the stable operation of the organization" is due greater deference under *Connick.*

Finally, grievant's lofty position at the magazine is not insignificant in the calculus. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin,* ___ U.S. at ___, 107 S. Ct. at 2900. Distinguishing between high-level public officers and those comprising the rank and file, the Ninth Circuit recognized that "the first amendment might not prohibit the dismissal of a high level public employee obligated to implement an administration's policies if the employee refused to support those policies and sought to undermine them publicly." *McKinley* v. *City of Eloy,* 705 F.2d 1110, 1115 (9th Cir. 1983). The instant case presents us with those exact circumstances, and we hold that grievant's dismissal did not offend the First Amendment.

## IV.

The First Amendment is not the sole foundation of grievant's free speech claim, however; he also cites the guarantees of Chapter 1, Article 13 of the Vermont Constitution. Because Article 13 explicitly recognizes the right to freedom of speech "concerning the transactions of government," grievant argues that this provision requires greater deference to speech concerning government matters than does its federal counterpart.

Although a textual comparison of the two constitutional provisions lends some support to grievant's proposition, its significance is questionable in light of *Pickering* and its progeny. Federal case law has made clear that the First Amendment is highly protective of public employee speech on matters of public concern, a similar but broader concept than speech regarding "transactions of government." To the extent that the specificity of Article 13 is an indication of greater protection in this area, the provision is more applicable to the whistleblower than to the disgruntled state officer.

In *Wickwire* v. *State*, 725 P.2d 695 (Alaska 1986), the Supreme Court of Alaska considered a similar argument under Article 1 of the Alaska Constitution, which states in part: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." The court expressed some reservations about the *Connick* approach and stated that "there may be instances where we would find that certain speech addressed a matter of public concern and was protected under Alaska's Constitution even though a federal claim might yield a contrary result. However, this is not such a case." *Id.* at 703. Like the Alaska court, we reserve judgment on the question whether Article 13 mandates greater deference to a public employee's right to free speech. Even assuming greater deference, grievant's interest in this particular speech conduct would not outweigh the State's interest in efficient operations and employee discipline. We hold that the protections provided by Article 13 do not immunize grievant from the consequences of his misconduct.

Finally, grievant maintains that Chapter I, Article 4 of the Vermont Constitution requires a remedy for the employee discharged in circumstances involving protected speech conduct, and he suggests that the public employer compensate the dismissed employee with "front pay" in lieu of continued employment. This

argument was not made before the Board and not preserved for appeal. *In re Johnston*, 145 Vt. 318, 321, 488 A.2d 750, 752 (1985). In any event, we see no reason why a public employer, confronted by an employee using public speech as a vehicle for insubordination, should be forced to choose between retaining the employee and providing him with a financial windfall.

*Affirmed.*