**F.D.R. FOX, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

Civil Action No. 91–0671–LFO.

United States District Court, District of Columbia.

Nov. 25, 1997.

John H. Jamnback, Boraks & Jamnback, Washington, DC, for Plaintiff.

David Cleveland, Asst. Corporation Counsel, Washington, DC, for Defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff filed this suit under 42 U.S.C. § 1983, alleging that he was terminated from his position as the director of security of the District of Columbia Lottery Board because he reported to the Metropolitan Police Department a theft of funds from the D.C. Lottery Claims Center, and that such termination violated his constitutional rights to free speech and due process.[1] Defendants were granted summary judgment on the due process claim, *see* March 22, 1994 Memorandum and Order, and the First Amendment claim went to trial in February 1995. After plaintiff presented his case-in-chief, a verdict was directed for the defendants on the grounds that Fox's report of the theft of funds was not a matter of public concern, and therefore not protected by the First Amendment. *See* February 17, 1995 Memorandum and Order. The Court of Appeals reversed, holding that plaintiff's report of the theft of funds was a matter of public concern. *Fox v. District of Columbia,* 83 F.3d 1491 (D.C.Cir. 1996). The Court of Appeals also vacated the earlier grant of summary judgment, holding that plaintiff's due process claim should be held in abeyance until he had adequate opportunity to pursue an administrative remedy.

This ruling necessitated a second trial on plaintiff's First Amendment claim. On January 31, 1997, a jury determined via special verdict that (1) plaintiff proved by a preponderance of the evidence that his reporting to the Metropolitan Police Department the theft of funds from the D.C. Lottery Claims Center was a substantial or motivating factor in defendants' decision to terminate him; and (2) defendants did not prove by a preponderance of the evidence that they would have terminated the plaintiff even if he had not reported the theft to the Metropolitan Police

---

1. Plaintiff's complaint also raised a Fourteenth Amendment equal protection claim, which he appears to have abandoned. In any event, such claim will be dismissed for lack of prosecution.

Department. The jury also determined that Fox was entitled to $10,000 in compensatory damages, and that "defendants' termination of plaintiff was malicious or willful or in reckless disregard of plaintiff's rights," warranting an award of punitive damages in the amount of $100,000.

That special verdict did not resolve the case. Plaintiff's First Amendment claim also required a legal finding as to whether his interest in commenting upon matters of public concern outweighed the interest of the Lottery Board in promoting efficient public service. *See Pickering v. Bd. of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see also* Pl's Mot. for Partial Summ. Judg. (96–1). Plaintiff moved for summary judgment on this issue on the eve of trial, and a ruling was deferred until after the verdict. *See* January 24, 1997 Notice to Counsel (94–1). By stipulation of the parties, issues concerning backpay and other damages were also reserved for post-trial determination by the Court, following additional discovery and briefing. *See* February 13, 1995 Stipulation (73–1). Finally, the parties filed numerous post-trial motions, including defendants' motions for judgment notwithstanding the verdict, a new trial, and/or remittitur; plaintiff's motion to "clarify" or amend the complaint; and defendants' motion to amend the answer.

Assuming, as the Court of Appeals decided, that plaintiff's report to the police was a matter of public concern, I conclude that his interest in that speech did outweigh the interest of the Lottery Board in promoting governmental efficiency. Plaintiff thus has a colorable claim under the First Amendment. However, several fundamental legal issues concerning liability of the various defendants under § 1983 were either not raised or were improperly framed by the parties prior to submission of the case to the jury. For this reason, defendants' motion for a third trial must be granted in order to avoid a miscarriage of justice. Plaintiff's motion to amend the complaint is granted, to the extent that

he may proceed to trial on the theory that defendant Sylvia Kinard is liable in her individual capacity for any violation of his First Amendment rights. Defendants' motion to amend the answer is likewise granted; the motion for remittitur is denied as moot. Plaintiff is also directed to show cause why his due process claim should not be dismissed for lack of prosecution.

## I.

### Plaintiff's First Amendment Claim

█ The Supreme Court addressed the parameters of a public employee's First Amendment rights in *Pickering v. Board of Education* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Under *Pickering,* a public employee's cause of action has four elements. *Hall v. Ford,* 856 F.2d 255, 258 (D.C.Cir.1988). Two of these are questions of law to be resolved by the court: whether the employee's speech involves a matter of public concern, and whether the employee's interest in commenting on such matters outweighs the interest of the State, as employer, "in promoting the efficiency of the public services it performs through its employees." *Id.,* citing *Pickering,* 391 U.S. at 568.[2]

The Court of Appeals has already determined the first of these legal questions, by holding that the theft of $500 from the Lottery Claim Center was a matter of public concern. 83 F.3d at 1495. On January 24, 1997, plaintiff moved for summary judgment on the second question. Defendants effectively responded in their February 10, 1997 motion for judgment as a matter of law.

The Supreme Court has stated that in balancing the interests of the employee and the government employer under *Pickering,*

the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among

---

**2.** The second two elements are questions of fact left to the jury: whether the employee's speech was a "substantial or motivating factor" behind his or her discharge, and whether the government employer would have reached the same

decision absent such speech. *Hall v. Ford,* 856 F.2d at 258, citing *Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

co-workers. has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest.

*Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (internal quotations omitted).

■ *Pickering* inquires "whether there was, *in fact* an interference with the efficiency of the public services performed. Where no such interference is shown, the discharge cannot be sustained." *Tygrett v. Barry*, 627 F.2d 1279, 1282 (D.C.Cir.1980) (emphasis supplied); *see also Brasslett v. Cota*, 761 F.2d 827, 845 (1st Cir.1985) (detrimental impact must be objectively shown lest "public employers ... promiscuously offer a subjective explanation that could almost never effectively be rebutted"). Moreover, judicial review of the discharge "must be addressed solely to contemporaneous considerations." *Tygrett*, 627 F.2d at 1286. "[A]ny kind of reconstruction of the reasoning behind the discharge that provides the employer with a post hoc justification for its action cannot be allowed." *Id.*

### A.

■ It is undisputed that the manner, time, and place of the employee's expression and the context in which this "matter of public concern" arose is substantially as follows. On the morning of January 13, 1988, employees at the D.C. Lottery and Charitable Games Control Board discovered that a safe located at the claims center—evidently left unlocked overnight—was missing a little over $500. Fox, the Board's director of security, traveled from his office at Lottery Headquarters to the Lottery Claims Center to make some preliminary inquiries. He interviewed three employees, including Laverne Hinds, the custodian of the funds. He returned to Lottery headquarters and reported his findings to Bernard Edwards, the Director of the Lottery Board. Edwards and Fox agreed to wait for the results of an audit before deciding how to proceed. On January 14, the audit concluded that $508.58 was missing from the safe. Fox and Edwards decided that the police should be notified regarding the theft of government funds. Fox called the police on January 15, 1988, and notified them about the theft of funds. Fox provided the police with a report.

On February 5th and 8th of 1988 defendant Sylvia Kinard, a deputy director of the Board, contacted Fox to determine why he was not interviewing suspects in the case. Fox responded that the matter was now a police investigation and thus no longer in the hands of the Lottery Board. He also told Kinard that he reported to Edwards, the director of the Board, and not to her. Kinard was not pleased with the manner in which Fox was handling of the matter. She testified that she thought his report to the police premature because Fox did not complete his own investigation first. Fox contended that the timing of his report was not really what bothered Kinard. Rather, it was his theory that Kinard was angry because his call to the police placed Laverne Hines, the Board employee responsible for safeguarding the missing funds and a relative of a friend of Kinard, under uncomfortable outside scrutiny—scrutiny that allegedly delayed a desired promotion for Hines. In any event, Kinard succeeded Edwards as the Board's acting director in March 1988 and promptly fired Fox.

### B.

Fox argues correctly that the *Pickering* balancing test—weighing the interest of the employee in commenting upon matters of public concern and the interest of the employer in promoting the efficiency of the public services it performs—tips in his favor. Fox points out that his job description, in fact, explicitly states that the Director of Security:

Plans, organizes and directs the investigation of all employees of the Board in cooperation and coordination with the Metropolitan Police Department.... Directs and coordinates the investigation of complaints and allegations of criminal or administrative violations and makes recommendations of their disposition to the Executive Director. Confers with prosecutors, attorneys, the Attorney General's representative or other law enforcement agencies regarding specific cases.

Pl. Part. Mot. Summ. J., Exh. C. at 2.

Fox acted within the scope of his authority as contemplated by his position description. He made a preliminary investigation of a "criminal or administrative violation," including interviewing witnesses and requesting an audit. He then made a "recommendation of [its] disposition to the Executive Director." That recommendation was to contact the Metropolitan Police Department. That is what he did, an action that the job description specifically contemplates.

Fox also points out that defendants conceded before the court of appeals that Fox "made no allegation to the media, did not participate in a demonstration, and made no communication for general distribution." *Id.* at 6. Fox also demonstrates that defendants have previously characterized Fox's report of the theft to the police as "merely carrying out a routine job task in his capacity as Director of Security for the Lottery Board." *Id.* Fox also accurately states that is undisputed that he did not violate any regulations in making his report. Nor is there any evidence of record that Bernard Edwards, the director of the Board at the time of this incident, criticized Fox's performance of his duties as Director of Security with respect to this incident or any other. *See* Edwards Dep. at 8.

The government argues that Fox interfered with the efficiency of the workplace by failing to complete an internal investigation. Sylvia Kinard testified that she believed Fox should have completed an internal investigation instead of deferring to the investigation by the police. This showing is inadequate to justify Fox's termination for his exercise of protected rights. First, Fox called the police in consultation with Executive Director Edwards, as contemplated by Fox's position description. Second, the government has not demonstrated that any disruption caused by Fox's report to the police is the kind of disruption that adversely affects the efficiency of the workplace. In other words, Fox's report to the police might have ruffled some feathers-and perhaps even delayed a promotion-but there is no showing that the report materially affected the efficiency of the workplace. Third, to the extent that the record reflects any "disruption" resulting from Fox's failure to complete his internal investigation before calling the police, the disruption was *de minimis* in nature. Indeed, objectively, it was the correct way to deal with the situation. Prolonged internal investigation could delay and chill police professional activity, and lead to charges of "cover-up."

The only other evidence in the record that may support the employer's interest pursuant to the *Pickering* balancing test is the testimony of several of Fox's co-workers who stated that they did not have "trust and confidence" in him. Indeed, "detrimental impact on close working relationships for which personal loyalty and confidence are necessary" is a recognized factor of the *Pickering* balancing test. This concern, however, is not at issue here because *Pickering* requires an inquiry only as to whether "*the statement* impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." (emphasis added). *Rankin v. McPherson*, 483 U.S. 378, 388, citing *Pickering*, 391 U.S. at 570-573. The government made no showing that the lack of trust and confidence was attributable to the protected statement. Fox's coworkers, for example, testified that they were aware (by personal knowledge or otherwise) that Fox (i) may have included inaccurate or false information on his application for employment at the Lottery; (ii) looked out his office window with binoculars for purposes unrelated to work; and (iii) angered members of a

nearby church by informing them that they could not park in the Lottery headquarters' parking lot. Witnesses also drew adverse inferences from the fact that Fox kept a fishing rod and a stack of newspapers in his office although none of these inferences were apparently informed by personal knowledge. The lack of "trust and confidence" in Fox by his coworkers thus is not relevant to the *Pickering* balancing test because the government did not show that this opinion of Fox was attributable to the fact that Fox reported $500 in missing funds to the police before he completed an internal investigation. In sum, Fox's interest in commenting on matters what has been determined to be of public concern outweighs the government's interest in promoting efficiency in the workplace.

## II.

### Defendants' Motion for Post Trial Relief

On February 10, 1997, defendants moved for (i) judgment as a matter of law, or in the alternative, (ii) for a new trial, or in the alternative; and (iii) for remittitur. Plaintiff opposed on February 24, 1997.

### A.

■ Defendants' combined motion for post-trial relief lists six grounds, three of which appear to be questions of law, and thus potential grounds for judgment as a matter of law.[3] In moving for post-verdict judgment as a matter of law, defendants are limited to those grounds previously raised in their motions for a directed verdict. *See Whelan v. Abell*, 48 F.3d 1247, 1251 (D.C.Cir.1995). The only ground raised by defendants in their pre-verdict motions was that "no reasonable jury can rule in the plaintiff's favor." *See* Trial Transcript of January 29, 1997 at 79; Trial Transcript of January 30, 1997 at 61. Trial Transcript of January 29, 1997 at 79; Trial Transcript of January 30, 1997 at 61. Only the second ground of defendants'

motion-"Defendants were justified in terminating plaintiff, because plaintiff demonstrated that he was not competent to do his job"—arguably implicates the reasonableness of the jury.

■ Rule 50 provides that a court may grant a motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to have found" for the non-moving party. Judgment as a matter of law should only be granted "if viewing the evidence in the light most favorable to the [non-moving party] and giving him the advantage of every fair and reasonable inference that the evidence may permit, there can be but one reasonable conclusion drawn." *Richardson by Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 827 (D.C.Cir.1988). In this case, Kinard's own testimony indicated that she was dissatisfied with Fox's report to the police. Plaintiff introduced into evidence an interrogatory in which defendants were specifically asked to identify any performance-based reasons for Fox's termination, and failed to do so. In sum, there was ample evidence at trial from which a reasonable jury could conclude that Fox was fired because of his report to the police, rather than for any of the performance failures cited by defendants in their motion, meritorious though they may be. Defendants' motion for judgment as a matter of law must therefore be denied.

### B.

■ Defendants also moved, in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. Defendants cite no grounds for their request, other than a bare assertion that "the jury was clearly confused." Defs.' Mtn. for Jdgmt. at 1. However, "the court may grant a timely motion for a new trial for a reason not stated in the motion." FRCP 59(d). In-

---

**3.** The stated grounds are: "1. Plaintiff has not shown that his interest in expression outweighs the government's interest in promoting the efficiency of the public service. 2. Defendants were justified in terminating plaintiff, because plaintiff demonstrated that he was not competent to do his job. 3. No punitive damages should be awarded because there was no showing of exceptional

circumstances." Defs.' Mtn. for Jdgmt. at 1. The first ground has now been resolved in plaintiff's favor on plaintiff's motion for summary judgment. *See* Part I *supra*. Grounds 4 and 6 concern excessive damages, which are relevant only to the motion for remittitur; Ground 5 asks for a new trial on the grounds that the jury was "confused." *Id.* at 1–2.

deed, the court has a duty, as well as the power, to grant a new trial in order to remedy a "miscarriage of justice." 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure*, Civil 2d § 2803 (1995).

Here, it is undisputed that defendant Kinard, as Acting Executive Director of the Lottery Board, terminated plaintiff, and that Kinard was an agent of the District of Columbia. *See* Trial Transcript of January 31, 1997 at 24–25. However, it is now rudimentary "hornbook" law that § 1983 does not countenance *respondeat superior* liability for local governments; rather, it authorizes suits for constitutional deprivations inflicted pursuant to government custom or policy. *Monell v. Department of Social Services of City of New York, et al.*, 436 U.S. 658, 690–694, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978). A single action by a governmental official may rise to the level of government policy, *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), but only where the official has final policymaking authority for that area of the city's business. *Id.*, 475 U.S. at 482–83 (plurality opinion): *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 128–30, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion); 140–42 (Brennan, J., concurring). In *Praprotnik*, the plaintiff was a municipal employee transferred to a dead-end job and subsequently laid off in retaliation for exercising his right to invoke employee grievance procedures. 485 U.S. at 114–116. A jury found that these retaliatory actions violated plaintiff's First Amendment rights; however, the Supreme Court held that the city could not be liable under § 1983 when the officials responsible for the alleged constitutional deprivation—directors of two city agencies-possessed only the authority to make employment *decisions* (i.e. transferring

or terminating an agency employee), *not* the authority to set employment *policy* for the City of St. Louis. *See* 485 U.S. at 128–30 (plurality opinion.); 145–147 (Brennan, J., concurring). Even in dissent, Justice Stevens conceded that "If this case involved nothing more than a personal vendetta between a municipal employee and his superiors, it would be quite wrong to impose liability on the city...." *Id.* at 147.

Counsel for both parties neglected to address the *Monell—Pembaur—Praprotnik* line of cases in their briefs, which focused instead on issues concerning plaintiff's First Amendment rights, and his alleged status as a probationary employee. During the first trial, defense counsel raised *Monell* in an oral motion for a directed verdict which was eventually decided on other grounds.[4] *See* Trial Transcript of February 15, 1995 at 71–72. Between the first and second trials, new counsel entered an appearance on behalf of the defendants, and failed specifically to raise the *Monell* issue again.[5] And in the course of the second trial, plaintiff offered no argument or evidence to suggest that Sylvia Kinard had the final authority to make employment policy for the District of Columbia.[6] Indeed, during the second trial, Sylvia Kinard testified that her duties as Acting Director of the Lottery Board included "managing day-to-day operations, traveling to Lottery conferences and meetings, and giving direction to staff on special projects." Trial Transcript of January 30, 1997 at 4A–37.

The *Monell* doctrine as developed is a commonplace in the virtual flood of § 1983 cases brought in this Court against the District of Columbia. The raising of the *Monell* issue in the first trial carried the issue forward to the second trial, although counsel

---

4. The transcript from the first trial reveals plaintiff's counsel to be well acquainted with *Monell*, *Pembaur* and *Praprotnik*. *See* Trial Transcript of February 16, 1995 at 10–12.

5. The failure of Corporation Counsel to assert this fundamental and familiar limitation on municipal liability is inexplicable and unfortunate.

6. The *Praprotnik* plurality held that the existence of final policymaking authority is a question of state law, to be determined by the court prior to

submission to the jury. 485 U.S. at 125, 126. Joined by Justices Marshall and Blackmun, Judge Brennan concluded in his concurrence that the question is one of both law and fact, that is "rightly entrusted to a properly instructed jury." *Id.* at 143. Significantly, on facts remarkably similar to the instant case, both approaches led to the same conclusion: the city agency heads were not final policymakers in the area of municipal employment policy.

appear to have forgotten it. The Kinard testimony, which was the only evidence offered about the scope of her official duties, contained no suggestion that Kinard had authority to formulate employment policy for the District of Columbia. Despite the foregoing, after colloquy with counsel and a stipulation that Kinard was an agent of the District of Columbia, *see* Trial Transcript of January 31, 1997 at 24–26, I inexplicably approved and delivered the following jury instruction on municipal liability:

> You're instructed that Defendant Kinard, as Acting Executive Director of the D.C. Lottery and Charitable Games Board, was an official whose acts constituted actions of the District of Columbia and the Board. The District of Columbia and the Board are jointly liable for any damages in which the plaintiff has proved by a preponderance of the evidence to have been proximately caused by her actions in terminating him.

Trial Transcript of January 31, 1997 at 95. The instruction reflects the *respondeat superior* theory of municipal liability rejected by the Supreme Court in *Monell* and *Praprotnik.*

While it may be unusual for a court to grant a new trial on grounds raised in a first trial but not specifically called to its attention in a re-trial, in this instance, the jury instruction constituted such a fundamental and substantial error of law with constitutional ramifications, so that to let judgment stand against the District of Columbia under these circumstances would be a gross miscarriage of justice. For these reasons, a new trial must be granted with respect to the District of Columbia defendants, in which both parties will have an opportunity to brief the relevance of *Praprotnik* to the instant case, and file dispositive motions as appropriate. For reasons discussed in Part III *infra*, defendants' motion for a new trial will also be granted with respect to defendant Kinard. Defendants' motion for remittitur is thus moot.

---

7. Thus, to the extent that Kinard was sued in her official capacity, her liability is determined by

## III.

### Defendant Sylvia Kinard

During the course of a March 19, 1997 evidentiary hearing on the issue of punitive damages, the Court invited briefing as to whether Defendant Kinard was named in her official or individual capacity. On April 1, 1997, plaintiff moved for "clarification," or in the alternative, for leave to amend the complaint. Plaintiff requests that this court clarify that Kinard was sued in her individual capacity. Defendant opposed on April 14, 1997.

### A.

Government officials are not personally liable for damages when sued in their official capacities. *See Atchinson v. District of Columbia,* 73 F.3d 418, 424 (D.C.Cir.1996) (citing *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). A section 1983 suit for damages against municipal officials in their official capacities is thus equivalent to a suit against the municipality itself.[7] *Id.* Where the complaint fails to specify the capacity in which a government official is sued, the course of proceedings indicates the sort of liability plaintiff seeks to impose. *Id.* at 425 (citing *Graham,* 473 U.S. at 167 n. 4).

Plaintiff in this case obtained counsel only after filing his complaint. Both parties go to some length dissecting various components of the *pro se* complaint to divine some greater meaning as to the capacity in which Kinard was sued. These efforts shed little light on the issue. The simple fact remains that the complaint fails to specify the capacity in which Kinard is sued. The Supreme Court has unambiguously stated that in such circumstances, the "course of proceedings" defines the capacity in which the government official at issue is sued. *Id.*

### B.

Plaintiff first asks the court to "clarify," per *Graham,* that Kinard was in fact, in "the course of proceedings," tried in her individual capacity. Unfortunately, the course of the

---

the same standard that applies to the District of Columbia defendants, discussed *supra* in Part II.

proceedings in this case is ill-defined. Plaintiff makes a strong argument that by conceding that Kinard was theoretically liable for punitive damages, defense counsel implicitly acknowledged and consented to suit in her individual capacity.[8] However, other actions taken by defense counsel-in particular, their failure to vigorously assert a qualified immunity defense prior to trial-suggest an assumption that Kinard was being sued in her official capacity only.[9] As stated, the complaint gave her no notice that she was being sued individually. Kinard sat at the counsel table during the trial. But she was represented only by the Corporation Counsel, who was also (and primarily) representing the District. It may reasonably be inferred that if Kinard thought she was exposed as an individual to liability for compensatory and punitive damages, she would have had her own lawyer. Her stance was much more suggestive of that of a "corporate representative." It is difficult to discern which, if any, of these actions represents Kinard's true understanding of the nature of the suit.[10]

Neither were plaintiff's own litigation tactics entirely consistent with an individual-capacity suit. While plaintiff did consistently demand punitive damages, which would only be available in an individual capacity suit against Kinard, he neglected to present any evidence to the jury concerning Kinard's ability to pay such damages. More importantly, the jury instruction on liability, proposed by plaintiff's counsel and delivered by the Court, suggested that Kinard's liability was co-extensive with that of the District of Columbia defendants, an indicia of an official-capacity suit.[11] Finally, the special verdict form submitted to the jury, with the approval of plaintiff's counsel, refers only to "the defendants" collectively. In fact, plaintiff's counsel interrupted the Court's delivery of jury instructions to request a last-minute change in the special verdict form: where the form previously required the jury to

---

**8.** At the first pretrial conference on February 9, 1995, counsel for defendants made the following representations concerning Kinard's liability for punitive damages:

Ms. Maniscalco: Your Honor, I—I filed jury instructions with respect to punitive damages. As your Honor is aware, the District of Columbia cannot have punitive damages assessed in the case of Newport News—Newport City.

Also, the Lottery Board is only in this case, since it's not sui juris, is only in the case with respect to injunctive relief. Your Honor has already decided that.

*So the issue of punitive damages only goes to Ms. Kinard. The Lottery Board nor the District of Columbia is susceptible.*

The Court: Is she separate and represented?

Ms. Maniscalco: She's not.

The Court: Are you representing her?

Ms. Maniscalco: Yes I am, Your Honor.

Trial Transcript of February 9, 1995 at 31 (emphasis supplied).

A similar colloquy occurred during the second trial in the course of discussing jury instructions. Defendants were now represented by Mr. Cleveland:

Mr. Cleveland: I would suggest, Your Honor, that punitives are not proper in this case.

The Court: Do you want to argue that?

Mr. Cleveland: Yes, I dare say in the last 40 years there has been no jury that's been asked to award punitive damages against the District of Columbia because no judge has ever granted such a request; that punitive damages against the District as [sic] possible only under extraordinary circumstances and certainly not the case here.

*And certainly punitive damages against Sylvia Kinard, individually, are not proper because the overwhelming weight of the evidence is she did nothing wrong, number one and if she did something wrong, it certainly wasn't intentional. So punitives should not be in this case.*

Trial Transcript, Jan. 23, 1997 pp. 21–22 (emphasis supplied).

**9.** *Cf.* Rodney A. Smolla, *Federal Civil Rights Acts* § 14.04[3](a) (3rd ed. 1997) ("'Qualified immunity' ... is the form of official immunity most likely to be applied in § 1983 actions against officials in their individual capacities.... [A]s a practical matter, 'qualified immunity' is the workhorse defense of most § 1983 ... cases").

**10.** *See Atchinson,* 73 F.3d at 425 ("the examples cited by Atchison suggest not that the parties understood that Atchinson had sued Officer Collins in his individual capacity, but rather that lawyers on both sides misunderstood various points of law").

**11.** You're instructed that Defendant Kinard, as Acting Executive Director of the D.C. Lottery and Charitable Games Board, was *an official whose acts constituted actions of the District of Columbia and the Board. The District of Columbia and the Board are jointly liable for any damages* in which the plaintiff has proved by a preponderance of the evidence to have been proximately caused by her actions in terminating him.

Trial Transcript of January 31, 1997 at 25, 95 (emphasis supplied).

make separate findings of liability against each of the three defendants, counsel requested, without objection by defendants, that Kinard and the District of Columbia defendants be placed on a single line.[12] More significantly, with respect to punitive damages, the jury was asked "what amount of money would punish *defendants* and deter others from engaging in similar conduct in the future?" *See* Verdict (99–1) (emphasis supplied).

The foregoing points strongly to the conclusion that the case against Kinard was submitted to the jury as an official capacity suit. Their verdict cannot be characterized or "clarified" *ex post facto* as a finding of individual liability. Plaintiff's request for "clarification" is therefore denied.

### C.

In the alternative, plaintiff asks for leave to amend the complaint in order to name Kinard in her individual capacity. Federal Rule of Civil Procedure 15(b) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

As discussed above-whatever the muddled intentions of the parties-the case was not, in fact, tried as an individual-capacity suit. A "conforming" amendment naming Kinard in her individual capacity is thus inappropriate.

However, in light of the foregoing, the appropriate course of action is to grant defendants' motion for a new trial with respect to Kinard,[13] and thereafter to permit plaintiff to amend the complaint by naming Kinard as a defendant in her individual capacity.

As a general matter, the district court should grant leave to amend a complaint "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Atchinson,* 73 F.3d at 425 (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). With respect to the specific question of whether and when a § 1983 complaint may be amended to name a government official in his or her individual capacity, *Atchinson* clarifies that potential prejudice to the defendant is the key consideration.

Here, there is no reason to conclude that Kinard would be unduly prejudiced by such an amendment. As matters stand, the jury found that she acted maliciously, and is liable for § 100,000 in punitive damages. A new trial can hardly prejudice her. As discussed

---

12. The colloquy proceeded as follows:

Mr. Jamnback: I have a possible glitch. Is this, is there going to be a situation where they could find against Sylvia Kinard and not against the District, given the Court's instruction?

The Court: On the punitive damages. What's your point?

Mr. Jamnback: Section 3–B *where they find in favor of, this is not damages.*

The Court: I will ask the defendants, what do you want? Mr. Jamnback: Just one line. *One line for Sylvia Kinard for all three of them.*

The Court: All right. Does that suit you?

Mr. Cleveland: I am confused.

The Court: Well, why don't we just say leave out those words and just say "against the defendants?"

Mr. Jamnback: With one line.

The Court: Yes, all right. Does that suit you?

Mr. Cleveland: That's fine.

Trial Transcript of January 31, 1997 at 97–98 (emphasis supplied).

13. In addition to being an appropriate option, from a procedural standpoint a new trial may in fact be the *only* option. A court may not grant post-verdict judgment as a matter of law on grounds not raised by the parties prior to the submission of the case to the jury. *See, e.g., American and Foreign Ins. Co. v. Bolt,* 106 F.3d 155 (6th Cir.1997).

4

in Part II, defense counsel's discussion of punitive damages suggests that Kinard received some-though insufficient-notice that the suit might obtain in her individual capacity. Amendment of the complaint will provide her with clear notice that her personal assets are at stake, and allow her to consider (or reconsider) whether she wishes to obtain separate counsel. Whatever her choice, Kinard's counsel will also have the opportunity raise whatever defenses may be appropriate for an official sued in her individual capacity, conduct discovery appropriate to such a defense, and, after any trial, propose appropriate jury instructions.

Kinard objects to amendment on the additional grounds that a "new"claim is barred by the statute of limitations. The citation to *Lovelace v. O'Hara*, 985 F.2d 847 (6th Cir. 1993) is unpersuasive. In that case, the plaintiff had originally specified that the defendant police officer was being sued in his official capacity then sought leave to name the defendant in his individual capacity. Here, the complaint did not specify in which capacity Kinard was being sued. Kinard has had ample opportunity to clarify the nature of the suit, and at certain points, appeared (through counsel) to concede she was being sued in her individual capacity; she must bear some of the responsibility for the tardiness of plaintiff's request for leave to amend.

Kinard further claims that she is shielded by immunities that render plaintiff's proposed amendment futile. Her claim of absolute immunity is without merit, in that the Supreme Court has held the doctrine to apply only to a narrow class of judicial, legislative, and Presidential acts. *See Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). With respect to qualified immunity, Kinard indeed may be entitled such to a defense under law, but that determination is best made after full briefing of the issue by both parties.[14]

### IV.

#### Defendants' Motion to Amend Answer

Defendants' answer to the complaint failed to assert the defense of mitigation of damages. On April 23, 1997, defendants moved for leave to amend their answer to the complaint to assert the defense of failure to mitigate damages. Plaintiff opposes defendants motion, arguing that he was prejudiced by defendants' failure to assert mitigation of damages in their answer because he was not put on notice to document his efforts to obtain new employment. Plaintiff, however, was put on notice that defendants plaintiff's mitigation of damages would be a contested issue in this case. Defendants propounded interrogatories in October 1992 stating: "Describe fully the steps you have taken to obtain other employment since you terminated from the Lottery Board." Indeed, the parties stipulated that issues relating equitable relief, including backpay, would be resolved, if necessary, after a trial on the merits. In the course of post-trial briefing of these issues. defendants raised the question of mitigation in their March 10, 1997 Opposition to Plaintiff's Request for Reinstatement and for Back Pay. Both parties addressed the issue at a March 19, 1997 evidentiary hearing.

Finally, plaintiff cites no authority for the proposition that defendants are barred from asserting a defense of failure to mitigate damages where that defense was not asserted in the answer. Defendants point to several cases in which courts have granted defendants such relief. *See e.g.*, 100 F.3d 778, 785 (10th Cir.1996); *Sports Center v. Brunswick*, 63 F.3d 649, 652 (7th Cir.1995). In light of the fact that plaintiff is not unduly prejudiced by consideration of mitigation here, an accompanying order grants defendants' motion to amend their answer to assert a defense of mitigation of damages.

### V.

#### Determination of Backpay and Related Remedies

On March 7, 1997, plaintiff filed a motion requesting backpay, sickpay, prejudgment interest, and reinstatement. Defendants op-

---

**14.** For an explanation of the standard for granting summary judgment on the issue of qualified immunity, the parties' attention is directed to *Crawford-El v. Britton*, 93 F.3d 813 (D.C.Cir. 1996).

posed on March 10, 1997. Plaintiff replied on March 17, 1997. An evidentiary hearing was held on March 19, 1997. The parties filed proposed findings of fact and conclusions of law thereafter. Plaintiff's motion will be held in abeyance, pending the outcome of the new trial.

## VI.

### Plaintiff's Due Process Claim

On May 21, 1996, the Court of Appeals instructed that plaintiff should be given an opportunity to pursue an administrative remedy with the D.C. Office of Employee Appeals (OEA) concerning the Lottery Board's classification of him as a probationary employee. The Court of Appeals slated:

> On remand, if Fox indicates that we he will attempt to pursue his OEA remedy, the district court should hold the due process part of the case in abeyance until either it becomes moot (or simply empty) through OEA's having ruled upon Fox's career/probationary status on the merits, or resolution of Fox's due process claim becomes necessary because OEA denies Fox such a hearing due to the untimeliness of his petition. *If Fox does not wish to attempt an appeal to the OEA, his due process claim can be deemed abandoned and suitable for dismissal with prejudice.*

83 F.3d at 1496–97 (emphasis supplied).

At a status hearing on November 7, 1997, the Court inquired as to the status of Fox's case before the Employee Appeals Board. The parties represented that, approximately eighteen months after the Court of Appeals opinion, an administrative judge has yet to be assigned to hear Fox's case. Although not impossible, it seems unlikely that such a major delay in the adjudication of plaintiff's administrative claim could have occurred unless the plaintiff himself had effectively abandoned prosecution of it. It is also clear that the Court of Appeals did not intend that resolution of plaintiff's due process claim should be delayed indefinitely. Accordingly, plaintiff will be directed to show cause why his due process claim should not be dismissed for failure to prosecute.

\*      \*      \*      \*      \*      \*

An accompanying Order implements the decisions announced herein.

### ORDER

For reasons stated in the accompanying Memorandum, it is this 25th day of November hereby

ORDERED: that plaintiff's motion for partial summary judgment (96–1) is GRANTED; and it is further

ORDERED: that defendants' motion for judgment as a matter of law (104–1) is DENIED; and it is further

ORDERED: that defendants' motion for a new trial (104–1) is GRANTED; and it is further

ORDERED: that defendants' motion for remittitur (104–1) is DENIED as moot; and it is further

ORDERED: that plaintiff's motion to clarify the complaint (119–1) is DENIED; and it is further

ORDERED: that plaintiff's motion to amend the complaint (119–1) is DENIED IN PART, AND GRANTED IN PART to the extent that plaintiff may, in anticipation of a new trial, amend his complaint to name Sylvia Kinard in her individual as well as her official capacity; and it is further

ORDERED: defendants' motion for leave to amend the answer (127–1) is GRANTED; and it is further

DECLARED: plaintiff's motion for reinstatement, backpay and other damages (106–1) will be held in abeyance, pending the outcome of the new trial; and it is further

ORDERED: that, at the status hearing scheduled for December 2, 1997, plaintiff shall show cause why his due process claim should not be dismissed for failure to prosecute.